# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:18-CR-708 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH TYSON, | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **DISCLOSURE OF GRAND JURY** |
| Defendant. | ) | **TRANSCRIPTS AND MATERIALS** |

Pursuant to Fed. R. Crim. P. 6(e), defendant Kenneth Tyson hereby moves this Court for an order requiring the government to disclose the complete transcript[1] of all grand-jury proceedings pertaining to Mr. Tyson's indictment, including any and all transcripts of statements made by the government to the grand jury.

## I.    INTRODUCTION

Mr. Tyson previously worked as a "Property Specialist" for the Land Bank.  Indictment, ECF No. 1, ¶ 1.  The Land Bank, among other things, contracts with demolition companies to demolish distressed properties.  *Id.* ¶¶ 2, 4.  As this Court is aware, this criminal case, based only on the uncorroborated statements of a cooperator, centers on allegations by the government that Mr. Tyson, in some unidentified way, "assisted and arranged" for RCI Services ("RCI") to be added to the list of "approved" demolition companies at the Land Bank because RCI's operator, one "M.R.," allegedly arranged to have a water line fixed, trees cut down, and concrete repaired

---

[1] This request includes all Jencks and any other statements and information presented to the grand jury.  The Court previously ordered the government to notify it of the timeline, extent, and substance of the Jencks material no less than two months prior to trial and reserved ruling on Jencks disclosures until after such notification.  Order, ECF No. 19, at 121.  Trial is set for February 18, 2020; as such, disclosures should have been made no later than December 18, 2019.

at a property owned by Mr. Tyson.  *Id.* ¶¶ 23–31, 52.  The government charged Mr. Tyson with bribery concerning programs receiving federal funds, honest services wire fraud, and conspiracy.

Prior to indictment, on October 18, 2018, Department of Housing and Urban Development ("HUD") Special Agent Robert Heiss requested a warrant ██████████████████████████ ███████████████████  Aff. in Supp. of App. for a Search Warrant ("Aff.") ¶ 1 (Ex. A).  The warrant application was supported by Heiss's Affidavit ("Affidavit"), ███████████ ████████████████████████████████████  ████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████  The warrant application was ultimately granted, and Mr. Tyson, of course, was ultimately indicted.  But subsequent developments have revealed that several  key  assertions  ████████████████  in  the  Affidavit  were  false  and  misleading.    The government may argue that it was not aware of these issues at the time it submitted the Affidavit, but even if that is true, it almost certainly was aware of them prior to indictment.  Mr. Tyson therefore has cause to believe that the government, despite knowledge of ██████ dissembling, continued  to  rely  on  ████  and  his  false  statements  in  its  presentation  before  the  grand  jury, irreparably corrupting the grand-jury process.  Mr. Tyson makes this motion to review grand jury transcripts to verify these particularized, well-founded concerns.

## II.    LAW AND ARGUMENT

"In our adversar[ial] system[] for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact."  *Dennis v. United States*, 384 U.S. 855, 873 (1966).  Accordingly, both the Federal Rules of Criminal Procedure and long-established case law provide for defense access to otherwise-protected grand jury materials under

certain circumstances.  Specifically, a "court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim P. 6(e)(2)(E)(ii).  A blanket request, *i.e.*, an indiscriminate "request for grand jury materials for discovery" is insufficient to trigger the government's production obligations under Rule 6(e)(2)(E)(ii).  *United States v. Johnson*, No. 05-CR-80025, 2015 U.S. Dist. LEXIS 83326, at *4 (E.D. Mich. June 26, 2015).  Rather, a defendant must show a "particularized need" for the requested materials.  *Dennis*, 384 U.S. at 870.  That is, the request must have "a factual basis."  *United States v. Naegele*, 474 F. Supp. 2d 9, 10 (D.D.C. 2007).  "[C]onclusory or speculative allegations" unmoored from the facts are insufficient.  *Id.*

For Rule 6(e)(2)(E)(ii) to apply, a defendant must also show "that a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury."  (Emphasis added).  Where "only" nonconstitutional error is involved, an indictment should be dismissed "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations."  *Bank of Nova Scotia v. United States* 487 U.S. 250, 256 (1988) (internal quotation marks omitted).  That is, "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[]."  *Id.* at 254.  This prejudice inquiry "must focus on whether any violations had an effect on the grand jury's decision to indict."  *Id.* at 263.  Regarding constitutional error, "[t]he knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989).  *See also, e.g.*, *United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983) ("Due process considerations

3

prohibit the government from obtaining an indictment based on known perjured testimony."). "[A]

prosecutor . . . is sworn to ensure that justice is done, not simply to obtain an indictment."  *Id.* at

760.  In short, "prosecutorial impairment of the grand jury's independent role" requires dismissal.

*United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (internal quotation marks omitted).

### A. <u>Mr. Tyson Has a Particularized Need for Access to the Grand Jury Transcripts.</u>

The Affidavit is a deeply flawed document.  It contains multiple false statements.  And it

failed to disclose to the magistrate judge that ▉▉▉▉ was a pathological dissembler with an extensive

criminal history involving multiple crimes of dishonesty—information that would, at the very

least, have called the reliability of ▉▉▉▉ alleged statements contained therein into serious doubt.

These easily avoided elementary flaws in the Affidavit are troubling enough standing alone.  But

given the short amount of time that passed between the Affidavit's submission and Mr. Tyson's

indictment, and coupled with the fact that the allegations in the indictment largely mirror those in

the Affidavit, there is reason to believe that these falsehoods and failures to disclose—in addition

to other, related problems detailed below—were perpetuated in the government's presentation to

the grand jury, likely playing a dispositive role in that body's decision to indict Mr. Tyson.

In light of these particularized concerns, Mr. Tyson seeks immediate access to the grand

jury transcripts—those containing the testimony or statements of ▉▉▉▉, of HUD-OIG Special

Agent Heiss, and of any other person who testified before, spoke to, or instructed, the grand jury

regarding Mr. Tyson or the conduct alleged in the indictment—to determine whether the

government knowingly presented evidence to the grand jury that was false and whether the

government failed to inform the grand jury of ▉▉▉▉ severely compromised credibility.

Furthermore, given the complexity of the crimes charged and the scant allegations in the

indictment to support the elements of those violations, Mr. Tyson has reason to believe that the

4

government's instructions to the jury were erroneous.  Review of the transcripts is also necessary to determine whether this profoundly prejudicial error actually occurred.

    **1.**   **Just as it did in the Affidavit to Magistrate Judge Parker, the Government Likely Improperly Withheld from the Grand Jury ▮▮▮▮ Criminal Record, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and Other Key Facts Bearing Heavily on His Credibility.**

The government committed misconduct by failing to advise the grand jury about ▮▮▮▮ significant credibility issues.  Though he has requested it—and repeatedly renewed that request— the government has refused to provide Mr. Tyson with discovery regarding ▮▮▮▮ criminal history.  But despite the government's stonewalling, the defense has been able to piece together at least part of ▮▮▮s extensive rap sheet.  His criminal record includes, at minimum, the following:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – Pled to/Convicted of Passing Bad Checks (§ 2913.11), a felony; Persistent Disorderly Conduct (R.C. § 2917.11), a fourth-degree misdemeanor (Ex. B);

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – Pled to/Convicted of Assault (R.C. § 2903.12), a first-degree misdemeanor (Ex. C);

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – Extradition Proceedings to Colorado pursuant to R.C. § 2963.07 (Ex. D);

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – Pled to/Convicted of Unauthorized Use of Property (R.C. § 2913.04), a fifth-degree felony (Ex. E);

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – Pled to/Convicted of the following: Theft (R.C. § 2913(A)(2)), a third-degree felony; Defrauding Creditors (R.C. § 2913.45), a third-degree felony; Grand Theft (R.C.  § 2913.02, a fourth-degree felony; Defrauding Creditors (R.C. § 2913.45), a fourth-degree felony; Criminal Simulation (R.C. § 2913.22), a fourth-degree felony; Theft (R.C. § 2913.02(A)(2)), a fourth-degree felony; and Defrauding Creditors (R.C. § 2913.45), a fourth-degree felony (Ex. F);[2]

---

[2] As part of the plea agreement in that case, the court dismissed: Engaging in Pattern of Corrupt Activity (R.C. § 2923.32), a first-degree felony; Robbery (R.C. § 2911.02), a third-degree felony; Grand Theft (R.C. § 2913.02), a fourth-degree felony; Defrauding Creditors (R.C. § 2913.45), a

- ███████████████████████████████ – Pled to/Convicted of False Statements to a Bank (18 U.S.C. §§1014 & 2), a class B felony (Ex. G).[3]

The records of these offenses are, of course, public, and there can be little doubt but that the government and Agent Heiss were aware of ████ extensive criminal history. [4]

There is similarly little doubt—in light of the extent of his criminal record and the crucial role ████ plays in the government's case—that the government was obligated to disclose this information in its Affidavit. "When an affidavit relies on hearsay information from a confidential informant, the judicial officer (and reviewing court) must consider the veracity, reliability, and basis of knowledge for that information as part of the totality-of-the-circumstances review." *United States* v. *Helton,* 314 F.3d 812, 819 (6th Cir. 2003) (citing *Gates,* 462 U.S. at 238, 103 S.Ct. 2317). "[A]n affidavit must state facts supporting an independent judicial determination that the informant is reliable." *United States v. McCraven,* 401 F.3d 693, 697 (6th Cir. 2005). *See also United States v. Levasseur,* 699 F. Supp. 965, 986 n. 36 (D. Mass.) *rev'd in part on other grounds* 846 F.2d 786 (1st Cir. 1988) (it was "beyond question" that the affiant should have provided information concerning the government informant's psychiatric history to the magistrate judge). Yet despite this obligation, the government did not disclose any of this information in the Affidavit. Mr. Tyson, thus, has reason to believe that the government misled the grand jury in the same way.

---

third-degree felony; Defrauding Creditors (R.C. § 2913.45), a fourth-degree felony; Theft (R.C. § 2913.02(A)(2)), a third-degree felony; and Theft (R.C. § 2913.02(A)(2)), a fourth-degree felony

[3] The court dismissed two additional counts of False Statements to a Bank.

[4] Additionally, any argument the government may make to the effect that it was unaware of ███ unreliability is severely undercut by the fact that ████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████

6

Ironically, though the government was careful to conceal the reality concerning ▮▮▮ when it came time to request a search warrant in this matter (and likely also when it presented its case against Mr. Tyson to the grand jury), the government's counterparts in the ▮▮▮▮▮▮▮ ▮▮▮ did not hesitate to highlight ▮▮▮▮ troubling history when it suited their interests. In ▮▮▮, ▮▮▮ was indicted for making false statements to a bank, resulting in damages to the bank in excess of $500,000. ▮▮▮ was sentenced to 24 months' imprisonment (to be served concurrently with his ▮▮▮▮▮▮▮ sentence) and 5 years' supervised release. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

▮▮▮ federal prison term expired in ▮▮▮, and he was released from his state sentence on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On ▮▮▮▮▮, *years* into his term of supervised release, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, arguing that his "behavior following release demonstrates that he is not a threat to reoffend."[5] ▮▮▮▮▮. The U.S. Attorney's Office adamantly opposed the motion, arguing to ▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The government noted that ▮▮▮ "criminal record includes numerous crimes involving deception and dishonesty," and stated that "he has criminal convictions dating back to ▮▮▮ for offenses involving theft and deception." ▮▮▮▮

---

[5] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

The Court agreed with the government and denied ███████ motion: "considering the serious nature of the offense, whether the public is adequately protected from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities, ███████ should serve his full sentence. ███████ was convicted of a very serious offense." ████████████████████ ██████████████████████████████████████████████████████████. It further noted, "[i]n addition to the instant offense, ███████ criminal history includes numerous crimes involving deception and dishonesty." *Id.*

Just as the Government should have disclosed ███████ extensive criminal history, so too should it have disclosed to the Magistrate Judge—and subsequently to the grand jury—███████ ████████████████████████████. But the Affidavit was mum on the fact that ████████████████████. It thus is likely that the government withheld this information from the grand jury as well. The fact that ███████████████████, had it been disclosed, would have given the grand jury even more reason to question ███████ veracity.

The Affidavit and subsequent indictment relied largely, if not exclusively, on uncorroborated statements provided by ██████. The failure of the affiant to include any of the above information in the Affidavit despite this extraordinary reliance on ██████ is inexcusable. And given the close relationship—both in timing and in content— between the Affidavit and the indictment, the possibility that the government likewise concealed this information in its presentation to the grand jury is too likely, and too prejudicial, to ignore.

In short, the defense needs to review the grand jury transcripts in order to determine whether any, or all, of these highly probative facts omitted from the Affidavit were concealed from the grand jury as well.

2. **Evidence Suggests that the Government Also Presented False Information to the Grand Jury.**

The government committed constitutional violations by presenting false information to the grand jury. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████  ████████████████████

████████████████████████ But many of these "facts," including facts essential to the viability of the government's case, are likely—and some are demonstrably—false.

The inaccuracies in the Affidavit are varied in their facial significance, but each is important in that it evidences the government's cavalier take on its duty to investigate and highlights the government's unwillingness to conduct even minimal investigation to corroborate its largely baseless allegations.  The Affidavit states, for example, that ██████████████

████████████████████████████████████████

████████████████████████████  ████████████. ███

████████████████████████████████████

████████████████████████████████████

████████████████ Indeed, the tree wasn't removed until *weeks later*.  Furthermore, the tree in the back yard—*i.e.*, the ████████████████████████—was *never* removed and remains on the property to this day.  These details might seem relatively inconsequential at first blush, but in fact they are quite significant.  They serve as concrete examples of the government's careless approach to this case, blind faith in ████, and failure to review the evidence *in its own possession* to determine whether ████ assertions were true.

Moreover, crucial to the version of events relayed in the Affidavit, Agent Heiss averred

that ███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████. ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████. But this assertion is false, and the government possesses

documents proving as much.  A review of the call detail records from ██████ ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ (the indictment says the water line was

installed "[o]n or about October 21, continuing through on or about October 24, 2013, Indictment,

ECF No. 1, ¶ 30).  ██████████████████████████. That telephone number is the office

number assigned to James Maher, the Land Bank's Commercial Demolition Officer.  "Who We

Are," Land Bank, http://cuyahogalandbank.org/staffBoard.php (last visited Dec. 26, 2019).  The

fact that these communications occurred directly contradicts ██████ assertion as relayed in the

Affidavit.

Further, on October 18, 2018, a representative of the Land Bank emailed Agent Heiss, "a

more legible scan of the first page of the [RCI] prequal document that shows a received date of

06-25-13" on the day the search-warrant application was approved.  (Ex. L).  On June 25, 2013,

████████████, on behalf of RCI Services (the company operated by M.R.) filed an application

to become a certified contractor with the Land Bank. (Ex. M)  Only four minutes after receiving

the application, ██████████████, a Land Bank employee, responded.  (Ex. N).  She sent a notice

of receipt to ████████ and also stated, ███████████████████████████████████



██████████████."[6] *Id.* (emphasis).  The next day, ██████████ *again* followed up with █████████ : ██████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████.  This is yet more evidence—which the

government had at the time of indictment—that the assertion that ████████████████████

██████████████████████ was patently false.[7]

Not only do these communications show that █████████████████████████████

███████████████████ was false, they show that his core allegation, and likewise the

heart of the government's case, is a fraud.  The government's case depends on the assertion that

M.R. prevailed upon Mr. Tyson to "arrange for RCI Services to be put on the [Land Bank] qualified

demolition contractor list and for RCI Services to be invited to bid on [Land Bank] demolition

jobs."  Indictment, ECF No. 1, ¶ 25(c).  But as these communications show, the government had

in its possession, *prior to indictment*, smoking-gun evidence that the █████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████.  Yet despite this clear

evidence, which plainly contradicts █████ bald assertions, the grand jury still indicted, and the

indictment still included allegations like those in paragraph 25(c).  This strongly suggests that the

government withheld this crucial information—concerning not only the reliability of █████ but the

plausibility of the entire indictment—from the grand jury.

---

[6] Thus, not only had █████ and his company received communication from the Land Bank well
prior to his alleged work at the Castleton Road property, they had received communication
███████████████████████████████████████████—a decision over which
Mr. Tyson had no control.  This guts the indictment, as every count thereof is dependent on the
errant theories that Mr. Tyson had a say over who was added to the Land Bank's contractor list.

[7] Heiss received the email from the Land Bank before the Magistrate authorized the warrant.

Next, the Affidavit also falsely states that ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████.  But the phone records and cell site location data acquired by the

government and (partially) produced, after much wrangling, to Mr. Tyson, show that this isn't true

either.  Though the Affidavit is not specific on the dates or times of the water-line work, the

indictment alleges that "[o]n or about October 21, continuing through on or about October 24,

2013," four individuals, including M.R., "installed a new waterline at Tyson's property."

Indictment, ECF No. 1, ¶ 30.  An analysis of the █████ records produced in response to the warrant

shows that ███████████████████████████████████████████████████

███████████████████████—certainly not the connection history of an individual spending

entire work days at a single location.  ███████████████████████.

Moreover, during this same four-day time period, the █████ records show ████████████

██████████████████████████████████████████████████████████████

█████████████████████  That number belongs to Drain Guru's ████████████████

███████████████.  The indictment alleges that J.S.—███████████████████████—and

M.R. installed the waterline *together*.  Indictment, ECF No. 1, ¶ 30.  Yet these two men, supposedly

working side-by-side over multiple days, were at the same time in constant contact via cell phone,

a clear indication that they were *not* in each other's physical presence.

Finally, there is even more evidence that the government knew of the falsity of █████

allegations.  While the typical progression from warrant affidavit to indictment is from generality

to greater detail as the government obtains additional information, here the government got things

12

backwards, *dropping* from the indictment details previously included in the Affidavit.  For example, though the Affidavit alleged that the purported meeting at the center of the indictment, *see* Indictment, ECF No. 1, ¶¶ 25-26, ███████████████████████████████████ ████████████████████████████████, the indictment distances itself even from these minimal details—likely because sometime after submitting the Affidavit but before indictment the government realized that ██████ allegations were false.  *Compare* Affidavit ¶¶ 9 -10, *with* Indictment, ECF No. 1, ¶¶ 25-26.  Accordingly, the indictment alleges only that ██████ "arranged a meeting and introduced M.R. to Tyson."  Indictment, ECF No. 1, ¶ 26.  The government's resort to ambiguity assists in concealing the falsity of the allegation and also makes defense via alibi, for example, virtually impossible.  *See* Defendant's Motion for a Bill of Particulars, ECF No. 72-1, at 4–5.  It also demonstrates the government's belief in the falsity of ██████ testimony and information, which it relied upon anyway.

### 3. The Government Likely Mis-Instructed the Grand Jury Regarding the Elements of Honest Services Wire Fraud.

A complete review of the discovery prior to indictment would have made clear to the government that the charges were not supported by the evidence in the government's possession.[8]  Count 1 of the indictment charges Mr. Tyson with Conspiracy to Commit Bribery & Honest Services Wire Fraud ("HSWF"), in violation of 18 U.S.C. § 371.  And counts 2 through 4 charge him with HSWF, in violation of 18 U.S.C. §§ 1343 & 1346.  Though the HSWF statute is, on its face, very simple, it is also vague, and that vagueness has resulted in a notoriously complex and

---

[8] The government admitted previously that it did not review all discoverable material prior to indicting.  On January 17, 2019, almost two months *after* the indictment, the government stated that, "due to the massive amount of emails the government intends to produce, the government has not had the opportunity to review each email it intends to produce.  It would be equally time-consuming and burdensome for the government to attempt to review each email and redact all personal identifying information."  ECF No. 11, Page Id #59.

evolving body of case law. In attempting to bring an HSWF charge, the government must first determine whether the alleged perpetrator—here, Mr. Tyson—is a private person or a public official. The jury instructions for, the elements of, and the evidence necessary to prove, HSWF vary significantly depending on whether an individual is charged under a public official or private person theory.

In *United States v. Frost*, 125 F.3d 346, 366 (6th Cir. 1997), the Sixth Circuit held that private individuals may commit HSWF, but *only* by breaching a fiduciary duty and thereby depriving the person or entity to which that duty was owed of the intangible right to the honest services of that individual. Where a private individual is involved, the prosecution must prove "that the defendant intended to breach his fiduciary duty, and reasonably should have foreseen that the breach would create an identifiable economic risk to the victim." *Id* at 369. This is a far cry from the standard applied to public officials. *Id. See Lemire,* 720 F.2d at 1337, n.13 (addressing only private fiduciaries and suggesting that "[p]ublic officials may be held to a higher standard of public trust; and conflicts of interest may harm the public merely by giving the illusion of unfairness").

Sixth Circuit law makes clear that private-party and public-official HSWF are independent, even contrary, means of pursuing an HSWF indictment and conviction. Here, the government attempts to have its cake and eat it too by illogically pleading *both*. The first paragraph of the indictment alleges that "Tyson was an agent and fiduciary of the [Land Bank]," thus indicating a private-party theory of HSWF. Indictment, ECF No. 1, ¶ 1. But paragraph 54 states, to the contrary, that "Tyson . . . intended to devise a scheme . . . to deprive the [Land Bank] and the citizens of Cuyahoga County," thus clearly attempting to allege *public-official* HSWF. The government goes even further in attempting to blur the public and private versions of HSWF with

respect to Mr. Tyson, alleging that Tyson took "official action to benefit M.R.," that he "concealed" the "corrupt relationship" "from the [Land Bank and] the public," and finally that "Tyson performed and agreed to perform official acts in his capacity as Property Specialist at [the Land Bank]." *Id.* ¶¶ 23, 24, and 25(c). By using both "fiduciary" and "official act," and both the Land Bank and the "public," the government is blending opposing positions under the law.

Despite the fact that these two positions are logically disjunct, the grand jury was nevertheless convinced to indict as to both theories anyway. The only reasonable explanation for this is that the government badly misstated the law as to one or both theories, causing the grand jury to reach an otherwise logically unreachable conclusion. The likelihood of mis-instruction is even greater when one considers the government's incomplete investigation, blind reliance on ███, and conflicting positions in the indictment: No reasonable grand jury could have charged these crimes had it been provided the correct elements of the offenses. By misstating the law, the government created an indictment that is logically incoherent and legally untenable. Such misstatements are grounds for dismissal. *See, e.g.*, *United States v. Peralta*, 763 F. Supp. 14, 15, 18–19 (S.D.N.Y. 1991) (dismissing indictment, in part, because the prosecutor misstated the definition of "constructive possession" to the grand jury).

More importantly, this method of charging in the alternative creates an indictment insufficient for uncertainty. *United States v. MacKenzie, 170 F. Supp. 797, 799 (D. Me. 1959).* By misstating the law to the grand jury, the government created an indictment which would allow a jury to convict Tyson for committing an offense with two conceptual groupings, mutually exclusive of each other. *See United States v. Gipson*, 553 F.2d 453, 459 (5th Cir. 1977) (Gipson's conviction was reversed and remanded where it was impossible to determine whether all of the jurors agreed that the defendant committed acts falling within one of the two conceptual

15

groupings.)

### 4. The Government's Slapdash Investigation Will Translate to Other Egregious Errors Committed in the Grand Jury Proceedings.

The government's failure to thoroughly investigate resulted in constitutional violations which substantially influenced the grand jury's decision to indict. By its own admission, the government was not aware of its own discovery material. In December 2018, the government underestimated the volume of documents it had. On December 17, the government stated, "I don't think [discovery] is an unreasonable amount. I will verify with Tiffany." (Ex. R). Later, counsel for the government wrote to defense counsel on December 20, 2018, that in considering the defense's request to adjust protective order specifications, the government had underestimated the volume of materials that would need redaction. (Ex. S at 1). Also, as previously stated, *supra* at 16 n.6*, the government failed to review material information contained in discovery emails. Had it reviewed these emails prior to indictment, it would have appreciated the form and function of the Land Bank, the falsities of ███████ statements, and impossibility of Mr. Tyson's alleged conduct. Even through the indictment stage, the government remained blissfully ignorant of its own discovery.

Prosecutors have a fundamental duty to know the basics of a case and to comprehend the rudiments of *their own* evidence prior to urging a grand jury to endorse a criminal indictment. Flying blind in such situations is an egregious violation of due process. In light of the false statements in the Affidavit, Mr. Tyson has reason to believe that the government presented the same false statements to the grand jury. These constitutional violations are inexcusable. Had the government reviewed discovery prior to presenting the indictment to the grand jury, it most certainly would have realized that any reliance on ██████ was misplaced. Specifically, the evidence strongly suggests that the government presented false information to the grand jury, omitted

16

material information, and that the grand jury's decision to indict was premised largely, perhaps exclusively, on false information and material omissions.

### 5. Caselaw Supports the Conclusion that Mr. Tyson Has Shown a Particularized Need for Access to Grand Jury Transcripts.

These precise, concrete concerns plainly satisfy the "particularized need" requirement that a defendant must meet before access to grand jury materials will be granted. Indeed, courts in this circuit and across the country have found particularized need, and granted access to grand jury materials, in far less compelling situations. In *United States v. Hayes*, 376 F. Supp. 2d 736 (E.D. Mich. 2005), the court ordered disclosure, including "witness statements, investigative reports, and grand jury testimony," from *a separate case* brought against the government's star witness in its prosecution of defendant Hayes. *Id.* at 742. The court noted, as here, the witness at issue was "the centerpiece of the prosecution['s case], and a fair determination of his credibility is of paramount importance." *Id.* at 741.

In *Horizon of Hope Ministry v. Clark County*, 115 F.R.D. 1 (S.D. Ohio 1986), the court ordered production where the *civil plaintiffs* argued that the content of the transcripts would support their claim of conspiracy by the grand jury witnesses to deprive plaintiffs of their civil rights. *Id.* at 3–4. The "particularized need" test was met because, among other things, like the present case, "no other source c[ould] provide the information in the[] transcripts to the Plaintiffs." *Id.* at 3. *See also United States v. Naegele*, 474 F. Supp. 2d 8, 11–13 (D.D.C. 2007) (ordering production of "the entire grand jury record" six days before jury selection where evidence showed signature page on key document was not in possession of government at time of indictment and fact was not disclosed to the grand jury); *In re Grand Jury Proceedings Relative to Perl*, 838 F.2d 304 (8th Cir. 1988) (affirming order granting to civil plaintiff access to evidence presented to grand jury in related criminal matter).

**B.** **The Grand Jury Materials Will Show that "a Ground May Exist to Dismiss the Indictment" Because of Irregularities that Occurred "Before the Grand Jury."**

If the grand jury records do ultimately prove to include the knowingly false or incomplete testimony that Mr. Tyson has reason to believe that they might, then this misconduct requires dismissal of the indictment.  Should the grand jury records indicate what Mr. Tyson has reason to believe they will, he will present the irregularities in a motion to dismiss.  But given that a party seeking production of grand jury materials under Rule 6(e)(2)(E)(ii) must show "that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury," a brief discussion of the propriety of dismissal on the ground of presenting false and incomplete evidence is appropriate here.

As stated in greater detail above, *supra* at 4, where "only" nonconstitutional error is involved, such a dismissal is proper "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (citation and internal quotation marks omitted).  In other words, "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[]." *Id.* at 254.  Regarding constitutional error, however, "[t]he knowing use of false or perjured testimony constitutes a denial of due process if there is *any reasonable likelihood* that the false testimony could have affected the judgment of the jury." *Lochmondy*, 890 F.2d at 822 (emphasis added).

Here, assuming that ███████ false statements recounted in the Affidavit, or other statements akin to them, were presented to the grand jury, it is a virtual certainty that they "influenced"— indeed, they were likely largely determinative of—"the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 256.  Proof of their introduction would also engender "grave doubt that the decision to indict was free from the substantial influence of such violations." *Id.*  It is highly

18

likely that ▮▮▮▮ testimony—whether introduced firsthand or via the hearsay statements of a federal agent—was the *sole* evidence of criminal conduct presented to the grand jury. ▮▮▮▮▮



▮▮▮, had they been disclosed to the grand jury, would have irreparably damaged both his credibility and the government's case.  And that it chose to say nothing of what was perhaps the most consequential lie told by ▮▮▮▮ and related to Magistrate Judge Parker (and likely the grand jury): that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  This assertion, unsupported by any evidence save ▮▮▮▮ supposed testimony, is essential to the government's case.  But the evidence showed that in fact ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  This fact guts ▮▮▮▮ allegations and the government's case.  If it was concealed from the grand jury, the indictment must be dismissed.

Additionally, even if (as is most assuredly not the case) no single piece of false information provided by ▮▮▮▮ would have been enough to influence the grand jury's decision to indict, certainly the cumulative effect of these falsehoods—to say nothing of the government's likely concealment of ▮▮▮▮ criminal history, history of false statements, and the possibility that the government mis-instructed the grand jury as to HSWF—would have caused ▮▮▮▮ and the government to lose all credibility in the eyes of the grand jurors.  In short, there is ample cause to believe that the grand jury's decision to indict was influenced—indeed, likely controlled—by this misconduct.

The case law supports this conclusion.  In *United States v. Peralta*, 763 F. Supp. 14 (S.D.N.Y. 1991), for example, the court granted a motion to dismiss the indictment where the government had relied on a single hearsay witness before the grand jury who misstated the circumstances of the defendant's arrest (a significant factor in the underlying crime) and where the prosecutor himself had fumbled the definition of "construction possession."  *Id.* at 15, 18–19.  In *United States v. Provenzano*, 440 F. Supp. 561 (S.D.N.Y. 1977), the court dismissed a superseding indictment (and the original indictment) where the government relied on a transcript of its star witness's prior testimony (before the grand jury which authorized the first indictment) in securing the superseding indictment. "Here, where the Government was aware, or certainly should have been, that their key witness recanted his prior testimony, the use of his [previous] testimony misled the Grand Jury, depriving them of an opportunity to make an independent evaluation of the case." *Id.* at 565.

Finally, in *United States v. Lawson*, 502 F. Supp. 158 (D. Md. 1980), the grand jury proceedings suffered from only one of the multiple flaws likely present here, yet the *Lawson* court found that flaw serious enough to warrant dismissal.  The government alleged a conspiracy in which defendant Lawson, a pharmacist, "filled fictitious prescriptions[] written by" a specific doctor.  *Id.*  Sampson, another pharmacist, testified favorably for Lawson before two separate grand juries, stating that Lawson attempted to verify the prescriptions, by phone, prior to filling them.  *Id.*  Lawson advised Sampson that he had called both the doctor's office and the police narcotics squad.  *Id.*  After the first indictment but before the second, the prosecution pulled, and analyzed, the pharmacy phone records for the day of the alleged offenses.  *Id.*  The records corroborated Sampson's testimony.  *Id.* at 162.  But the prosecution concealed these facts from the grand jury: "[R]ather than introducing the telephone records to corroborate Sampson's testimony

20

concerning the phone calls, the [AUSA] embarked upon a grueling cross-examination of Sampson, apparently designed to give the jurors the impression that Lawson had never [made the calls] and that Sampson was trying to cover for him." *Id.*

Quoting the Supreme Court, the *Lawson* court chastised the government for its decision to conceal the exculpatory facts found in the phone records. It reminded the government, in language especially relevant to Mr. Tyson's case, that "'[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Id.* at 171-72 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Equally applicable, the court noted that

> "while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened."

*Id.* at 170 (quoting *United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979)). Dismissal of the indictment was accordingly necessary: "Prejudice of this order cannot be eliminated at trial, and the court will not speculate that the grand jurors' decision might have been unaffected by the prosecutor's conduct." *Id.* at 172.

The parallels between *Lawson* and this case are striking. And, indeed, where the two cases differ, the government's potential conduct was more egregious *here*. Here, ███████████████ were obtained prior to his testimony (or an agent's testimony relying on ███████ statements) before the grand jury but after, and as a consequence of, his earlier statements to the government alleging both ████████████████████████████████████████████████████ *and* ████████

21

███████████████████████████████████████████████████████████

████████████████████. Exhibits K, and M-O.  Whereas in *Lawson* the phone records corroborated testimony tending to negate the charges the government sought to bring against the defendant, here the ███████████ belie the assertions of the government's *own* star witness.

In short, the government's concealment of information regarding ██████ unreliability, its concealment of evidence proving the falsity of ██████ assertions and the vacuity of its own case, its mis-instruction of the grand jury, and its cavalier approach to evidence will all likely be borne out by the grand jury transcripts.  If *any one* of these proves true, dismissal will be required.

### III.    CONCLUSION

Mr. Tyson has shown a particularized need for access to the grand jury materials in this case.  Based on a review of the Affidavit, the inconsistencies and inherent problems with the indictment, and other evidence presently available to Mr. Tyson, the grand jury transcripts will also support a dismissal of this indictment.  For these reasons and all others set forth above, Mr. Tyson moves this Court for an order requiring the government to disclose the complete transcript of grand jury proceedings pertaining to Mr. Tyson's indictment.

Respectfully submitted,

/s/ *Chris N. Georgalis*
Christos N. Georgalis (OH: 0079433)
Edward Fadel (OH:0085351)
**Flannery │ Georgalis, LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Telephone: (216) 367-2095
Email: chris@flannerygeorgalis.com

*Attorneys for Defendant Kenneth Tyson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 31, 2019, a copy of the foregoing redacted motion was filed publicly, with an unredacted version filed under seal, pursuant to ECF #78. Notice of this redacted filing will be sent to all parties by operation of the Court's electronic filing system. An unredacted version will be sent via email to counsel of record.  Parties may access this filing through the Court's system.

/s/ *Chris Georgalis*
Chris Georgalis

*Attorney for Defendant Kenneth Tyson*