## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:18-CR-708 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT'S MOTION TO DISMISS** |
| KENNETH TYSON, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Kenneth Tyson hereby moves the Court, pursuant to Federal Rule of Criminal Procedure 12(b) and for the reasons stated below, to dismiss the indictment in this case.

\* \* \*

The entire indictment in this purported bribery and honest-services-fraud case should be dismissed in light of the government's misfeasance before the grand jury.  The evidence shows that the government knowingly presented materially false information to the grand jury, withheld crucial information regarding the reliability of the government's star witness, and likely mis-instructed the jury on a core issue.  The first count of the indictment—the conspiracy count—should also be dismissed for the additional reason that the indictment fails to plead essential elements of that charge.  And the indictment's fifth and final count, charging bribery concerning programs receiving federal funds, must be dismissed for additional reasons as well:  It is untimely and fails to plead an essential financial-threshold element of that offense.

## ARGUMENT

I.   **The Indictment Should Be Dismissed Because the Government Knowingly Presented False Information to the Grand Jury, Hid Evidence Concerning M.R.'s Lack of Credibility, and Likely Mis-Instructed the Grand Jury.[1]**

A.   **Legal Standard**

Where misconduct before a grand jury involves "only" <u>nonconstitutional error,</u> an indictment should be dismissed "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (citation and internal quotation marks omitted).  That is, "as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[]." *Id.* at 254.  This prejudice inquiry "must focus on whether any violations had an effect on the grand jury's decision to indict." *Id.* at 263.

Regarding <u>constitutional error</u>, "[t]he knowing use of false or perjured testimony constitutes a denial of due process if there is *any reasonable likelihood* that the false testimony could have affected the judgment of the jury." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (emphasis added).  *See also, e.g.*, *United States v. Watson*, No. 3:11-CR-79, 2016 U.S. Dist. LEXIS 70688, at *15 (S.D. Ohio May 31, 2016) ("It is of course a violation of the Due Process Clause of the Fifth Amendment for a prosecutor to present testimony known to be false");

---

[1] Should the Court grant Mr. Tyson's Motion for Disclosure of Grand Jury Transcripts and Materials, ECF No. 80, Mr. Tyson will, provided the Court grants leave, supplement this section of his motion to dismiss with additional arguments and evidence, including specific citation to portions of the grand jury transcripts showing the government's misfeasance.  Mr. Tyson files his motion to dismiss without now, without benefit of that additional evidence, due to the currently operative January 28, 2020 deadline for pre-trial motions, anticipating that he will later be permitted to supplement his motion should the Court grant his request for access to the grand jury transcripts and materials.

*United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983) ("Due process considerations prohibit the government from obtaining an indictment based on known perjured testimony.").  "To prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Wogenstahl v. Mitchell*, 668 F.3d 307, 323 (6th Cir. 2012).  "[A] prosecutor . . . is sworn to ensure that justice is done, not simply to obtain an indictment." *Hogan*, 712 F.2d at 760.

Here, these three requirements have been met.  Further, there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Lochmondy*, 890 F.2d at 822.  And there is "grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia* 487 U.S. at 256.  Such "prosecutorial impairment of the grand jury's independent role" requires dismissal. *United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (citation and internal quotation marks omitted).

B.      **The Government Presented False Information to the Grand Jury.**

As discussed in detail in Mr. Tyson's Motion for Disclosure of Grand Jury Transcripts and Materials ("Grand Jury Motion"), ECF No. 80, and his Reply in support of the same ("Grand Jury Reply"; together with the Grand Jury Motion, the "Grand Jury Briefs"), ECF No. 90, the affidavit submitted in support of the government's application for a warrant to search M.R.'s telephone records (the "Warrant Affidavit") included several troubling false statements.  Most significant among them was M.R.'s false statement that he and RCI were unable to establish communication with the Land Bank until after he began the alleged work on Mr. Tyson's property.  This purported bribe is a cornerstone of the government's case, but as set forth in Grand Jury Briefs, documentary evidence proves not only that communication had been established between M.R. and RCI, on the

3

one hand, and the Land Bank, on the other, *before* the alleged bribe occurred.  It also proves that RCI had already been assured that it would be added to the Land Bank's approved contractor list— and that M.R. himself was in repeated contact with the Land Bank's commercial demolition officer—prior to the date of the alleged work on Mr. Tyson's property.  *See* Grand Jury Motion at 10-11; Grand Jury Reply at 6-7.

The Warrant Affidavit also contained the false statement that M.R. was present for the water line work that allegedly occurred at Mr. Tyson's the *entire time* that work was occurring. The telephone records obtained via the warrant, however, make clear that in fact M.R. was not on site throughout this period.  *See* Grand Jury Motion at 12; Grand Jury Reply at 8.  Further, the Warrant Affidavit contained the false statement that, as part of the alleged bribe, M.R. or those under his direction cut down a tree in the rear portion of Mr. Tyson's property.[2]

---

[2] The government's production of additional telephone records in response to this Court's January 16, 2020 order on Mr. Tyson's motion to compel—records that it, months ago, had claimed it had already produced—has yielded evidence of yet another instance of potential recklessness and, at any rate, further underscores the government's haphazard approach to discovery and the need for a review of its conduct before the grand jury.  The government initially produced a limited batch of telephone records to Mr. Tyson in February 2019.  Subsequently, Mr. Tyson repeatedly requested full production of these records via a series of letters to the government.  The government's continued recalcitrance on this point, and with respect to other discovery issues, necessitated Mr. Tyson's motion to compel, in which he sought access to these complete telephone records, *i.e.*, to all the records the government had obtained or consulted for its telephone "analysis."  Motion to Compel, ECF No. 60, at 5, 21-22, 26 (requesting the complete "telephone records" and "any other information" concerning the government's purported telephone analysis).

The government responded claiming that it had "provided the *records of these 270 telephone calls* to Defendant on February 12, 2019."  Opp. to Mot. to Compel, ECF No. 64, at 25 (emphasis added).  The Court, in its order on the motion to compel, understandably expressed some confusion regarding precisely what data was at issue and ordered the government to produce the telephone analysis *in camera*.  Op. & Order on Mot. to Compel, ECF No. 89, at 14.  Then, in the aftermath of this Court's order, on January 16, 2020, the government suddenly produced the telephone records Mr. Tyson had been seeking for nearly a year—the very records the government had told this Court, in its opposition to the motion to compel, that it had already produced.  This error, perhaps simply reckless rather than intentional, still fits a theme.  The government misled the magistrate judge in an effort to obtain its search warrant, misled the grand jury to obtain an

The temporal proximity of the Warrant Affidavit and the indictment—both issued approximately one month apart, *see* Indictment, ECF No. 1; Warrant Affidavit signed October 18, 2018—is a strong indication that this false information was not only included in the Warrant Affidavit but presented to the grand jury as well.  The government's response in opposition to the Grand Jury Motion only confirms this point.  While the government argues there that the at-issue statements were not false and that, even if they were, no remedy is available to Mr. Tyson, it nowhere argues that the statements were not presented to the grand jury, thus constructively admitting that they were.  *See* Gov't Opp. to Grand Jury Motion, ECF No. 87, at 5-10.

**C.     The Government Knew that the Information Presented to the Grand Jury Was False.**

It is likewise clear that the government knew, prior to indictment, that the above statements were false.  As to the false statement regarding M.R. and RCI's alleged inability to establish communication with the Land Bank, HUD-OIG special agent—and "prosecution team" member—Robert Heiss received, on the day the warrant to search M.R.'s telephone records was granted, a copy of email communications between RCI and the Land Bank proving that the "no communication" argument was false.  Grand Jury Motion at 10-11.  Similarly, telephone records produced *to the government* in response to the warrant show that M.R.'s claim that he was on site the entire time the water-line work was being performed is false.  *Id.* at 12.  And photographs contained in the discovery produced *by the government* show that the back-yard tree was never removed.  *Id.* at 9.  In short, the government had all of this evidence in its possession well before

---

indictment, and, it has now become clear, misled this Court in stating, in its October 2019 opposition to Mr. Tyson's motion to compel, that telephone records, produced just days ago, in January 2020, had already been produced.

the indictment issued; it has no room to argue that it did not know, at the time they were presented to the grand jury, that the above material statements were false and prejudiced Mr. Tyson.

### D.     The False Testimony was Material and Almost Certainly Affected—Indeed, Likely Dictated—the Grand Jury's Decision to Indict.

It is a virtual certainty that these false statements "influenced"—indeed, they were likely largely determinative of—"the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 256.  And by knowingly allowing this false testimony, the government has engendered "grave doubt that the decision to indict was free from the substantial influence of such violations." *Id.* Had it been disclosed to the grand jury, M.R.'s demonstrably false claims regarding his presence at Mr. Tyson's property throughout the period work was being done—in addition to his falsehood regarding what trees were removed as part of the supposed bribe—would have irreparably damaged both his credibility and the government's case.

And that is to say nothing of the most consequential lie likely told to the grand jury:   that M.R. and RCI were unable to establish communication with the Land Bank regarding adding RCI to its contractor list until *after* the supposed bribe—the alleged water-line work—was completed. This bald assertion is essential to the government's case.  But it is belied by the clear documentary evidence showing that in fact repeated, favorable communications, even including a pledge from the Land Bank to consider RCI Services for upcoming projects, had already occurred.  *See* Grand Jury Motion at 9-11.  Certainly this falsehood, supplying the sole motive for the alleged bribe, at minimum "influenced" the grand jury's decision to indict.

### E.     The Case for Dismissal is Strengthened Further by the Fact that the Government Withheld Material Information Regarding M.R.'s Credibility and Almost Assuredly Mis-Instructed the Grand Jury.

Additionally, even if (as is most certainly not the case) the cumulative effect of the false information outlined above would not have been enough to influence the grand jury's decision to

6

indict, certainly those falsehoods, coupled with the government's concealment of M.R.'s criminal history and history of false statements, as well as the likelihood that the government mis-instructed the grand jury, would have caused M.R. and the government to lose all credibility in the eyes of the grand jurors.

And there is little doubt but that the concealment and mis-instruction did in fact occur.  In the Grand Jury Motion, Mr. Tyson set forth in detail M.R.'s lengthy rap sheet (at least so far as it is known to the defense), his history of false statements, and the government's own on-the-record assessment of his credibility in a past criminal matter.  Grand Jury Motion at 5-8.  In its response, the government did not deny, and thus constructively admitted, that it failed to disclose any of this information to the grand jury, thereby violating *its own policy* and profoundly prejudicing Mr. Tyson.

Regarding mis-instruction, there is every reason to conclude that the government mis-instructed the grand jury on the elements of Honest Services Wire Fraud ("HSWF").  As explained in the Grand Jury Motion, Sixth Circuit case law makes clear that private-party and public-official HSWF are independent, even contrary means of pursuing an HSWF indictment, yet the indictment haphazardly and illogically pleads both, not in the alternative or disjunctively, but in a single, inscrutable amalgamation.  Grand Jury Motion at 13-15.  And the government has not explicitly denied mis-instruction.  *See* Gov't Opp. to Grand Jury Motion, ECF No. 87, at 10-11.  Additionally, further examination of the indictment shows that the government likely mis-instructed the grand jury regarding the elements of conspiracy to commit bribery concerning programs receiving federal funds as well.  As discussed in detail below, *infra* at 10, an entire element of that offense—purportedly pled in Count One—is missing from the indictment.  That the grand jury indicted in the absence of this element is yet further evidence that it was mis-

instructed by the government.

F.     **Precedent Shows that Dismissal is the Appropriate Remedy Here.**

The case law supports the conclusion that the government's misfeasance here warrants dismissal. In *United States v. Peralta*, 763 F. Supp. 14 (S.D.N.Y. 1991), the court granted a motion to dismiss the indictment where the government had relied on a single hearsay witness before the grand jury who misstated the circumstances of the defendant's arrest (a significant factor in the underlying crime) and where the prosecutor himself had fumbled the definition of "constructive possession." *Id.* at 15, 18-19. Likewise, in *United States v. Provenzano*, 440 F. Supp. 561 (S.D.N.Y. 1977), the court dismissed a superseding indictment (and the original indictment) where the government relied on a transcript of its star witness's prior testimony (before the grand jury which authorized the first indictment) in securing the superseding indictment. "Here, where the Government was aware, or certainly should have been, that their key witness recanted his prior testimony, the use of his [previous] testimony misled the Grand Jury, depriving them of an opportunity to make an independent evaluation of the case." *Id.* at 565.

Finally, in *United States v. Lawson*, 502 F. Supp. 158 (D. Md. 1980), the grand jury proceedings suffered from only one of the multiple flaws present here, yet the *Lawson* court found that flaw serious enough to require dismissal. The government alleged a conspiracy in which defendant Lawson, a pharmacist, "filled fictitious prescriptions[] written by" a specific doctor. *Id.* at 161. Sampson, another pharmacist, testified favorably for Lawson before two separate grand juries, stating that Lawson attempted to verify the prescriptions, by phone, prior to filling them. *Id.* Lawson advised Sampson that he had called both the doctor's office and the police narcotics squad. *Id.* After the first indictment but before the second, the prosecution pulled, and analyzed, the pharmacy phone records for the day of the alleged offenses. *Id.* The records corroborated

Sampson's testimony. *Id.* at 162. But the prosecution concealed these facts from the grand jury: "[R]ather than introducing the telephone records to corroborate Sampson's testimony concerning the phone calls, the [AUSA] embarked upon a grueling cross-examination of Sampson, apparently designed to give the jurors the impression that Lawson had never [made the calls] and that Sampson was trying to cover for him." *Id.*

Quoting the Supreme Court, the *Lawson* court chastised the government for its decision to conceal the exculpatory facts found in the phone records. It reminded the government, in language especially relevant to Mr. Tyson's case, that "'[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Id.* at 171-72 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Equally applicable, the court noted that

> while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.

*Id.* at 170 (quoting *United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979)). Dismissal of the indictment was accordingly necessary: "Prejudice of this order cannot be eliminated at trial, and the court will not speculate that the grand jurors' decision might have been unaffected by the prosecutor's conduct." *Id.* at 172.

The parallels between *Lawson* and this case are striking. And, indeed, where the two cases differ, the government's conduct was more egregious *here*. Here, M.R.'s phone records were obtained prior to his testimony (or an agent's testimony relying on M.R.'s statements) before the

grand jury but after, and as a consequence of, his earlier statements to the government—and then, in turn, to Magistrate Judge Parker—alleging both that M.R. was present for at least two entire days of the water-line installation *and* that he was unable to communicate with the Land Bank until after he allegedly met with Mr. Tyson at Castleton in late October, 2013. Grand Jury Motion, Exs. K, M-O. Whereas in *Lawson* the phone records corroborated testimony tending to negate the charges the government sought to bring against the defendant, here the phone records belie the assertions of the government's *own* star witness. But here, unlike *Lawson*, the grand jury was presented with additional falsehoods, was kept in the dark regarding M.R.'s reliability, and was almost certainly mis-instructed concerning the elements of HSWF as well as those of conspiracy to commit bribery concerning programs receiving federal funds.

In short, the evidence is strong that the government knowingly presented false information to the grand jury and that that information, along with the government's concealment of evidence related to M.R.'s reliability and its very likely mis-instruction of the grand jury, combined to prejudice the grand jury's judgment in this matter, irreparably harming Mr. Tyson and mandating dismissal of the indictment in its entirety.

## II. Count One of the Indictment Must Be Dismissed for the Additional Reason that it Fails to Plead Essential Elements of the Offense.

Count One of the indictment charges Mr. Tyson with two forms of conspiracy in violation of 18 U.S.C. § 371: conspiracy to commit bribery concerning programs receiving federal funds (federal-funds bribery, or "FFB") in violation of 18 U.S.C. § 666(a)(1)(B), and conspiracy to commit honest services wire fraud ("HSWF") in violation of 18 U.S.C. §§ 1343 & 1346. *See* Indictment, ECF No. 1, ¶¶ 21-52. But the charge must be dismissed for failure to allege an essential element of *both* types of conspiracy. First, as to the alleged conspiracy to commit FFB, the indictment fails to allege that Mr. Tyson participated in a conspiracy in connection with qualifying

10

Land Bank business valued at $5,000 or more.  Second, with respect to the purported conspiracy to commit HSWF, the indictment fails to adequately allege that Mr. Tyson owed a fiduciary duty to the "citizens of . . . Cuyahoga County."

It is blackletter law that an indictment must "contain[] the elements of the offense charged." *United States v. Resendiz-Ponce*, 549 U.S. 102, 103 (2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The offense of conspiracy to commit FFB requires, among other things, that "two or more persons conspired, or agreed, to *commit the substantive crime of bribery concerning programs receiving federal funds*."  *United States v. Dimora*, No. 10-CR-387, 2012 U.S. Dist. LEXIS 96460, at *11 (N.D. Ohio July 12, 2012) (Lioi, J.) (emphasis added).  *See* 6th Cir. Pattern Jury Instr. § 3.01A(s)(A) (conspiracy requires "that two or more persons conspired, or agreed, to commit" the substantive crime at issue).

Regarding the "substantive crime of bribery concerning programs receiving federal funds," *Dimora*, 2012 U.S. Dist. LEXIS 96469, at *11, the FFB statute contains, among other things, "three separate valuation requirements":

> **First**, the statute applies only if a local government or agency receives at least $10,000 in federal assistance in any one-year period. 18 U.S.C. § 666(b).
>
> **Second**, in order to be subject to the proscriptions of subsection (a)(1)(B) of the statute, a defendant must solicit, demand, accept, or agree to accept "anything of value" from another person.
> []
> **Finally**, the acceptance of "anything of value" must itself be shown to be *connected with a transaction "involving anything of value of $5,000 or more."*  18 U.S.C. § 666(a)(1)(B).

*United States v. Mills*, 140 F.3d 630, 632 (6th Cir. 1998) (emphasis added).  As to the third valuation requirement, the statute is explicit that the bribe at issue must be made "in connection with . . . business [or] transaction[s]" of the victim "organization, government, or agency" that are value[d] [at] $5,000 or more."  18 U.S.C. § 666(a)(1)(B).  Accordingly, in this case, it is an

11

essential element of conspiracy to commit FFB that "two or more persons conspired, or agreed," *Dimora*, 2012 U.S. Dist. LEXIS 96460, at *11, to effectuate the alleged bribe "in connection with" Land Bank business "value[d] at $5,000 or more," 18 U.S.C. § 666(a)(1)(B). *See also infra* at 20.

But Count One is *completely silent* on this element. The indictment pays lip service to the $5,000 requirement, but it wrongly applies it to the value of the alleged bribe rather than to the value of the Land Bank business at issue. Specifically, Count One alleges that the purported bribes "provided, completed, or paid for by M.R. involv[ed] $5,000 or more." Indictment, ECF No. 1, ¶ 22(b). But the alleged value of the bribe is irrelevant. And when it comes to what matters, Count One says *nothing* regarding the value of the Land Bank "business [or] transaction[s]" at issue. 18 U.S.C. § 666(a)(1)(B). Having failed to allege this essential element, the FFB portion of the conspiracy charge must be dismissed.[3]

Count One likewise fails to plead all the essential elements of conspiracy to commit HSWF. An essential component of HSWF is a fiduciary duty owed by the offender to the victim. *E.g.*, *United States v. Turner*, 465 F.3d 667, 675 (6th Cir. 2006) (Sixth Circuit honest-services precedent "require[s] the finding of a fiduciary duty owed by the defendant to the victim"); *Skilling v. United States*, 561 U.S. 358, 417 (2010) (Scalia, J., concurring) ("fiduciary duty" is "central to the 'fraud'" component of honest-services fraud). But Count One fails to adequately allege a fiduciary relationship between Mr. Tyson and an alleged victim.

---

[3] The government may argue that the $5,000 requirement applies to the value of the alleged bribe rather than to the value of the Land Bank business at issue. But such an argument would be contrary to the government's own Count Five of the indictment—which applies the $5,000 requirement to the value of the Land Bank business at issue—as well as contrary to law, as explained in detail below. *See infra* at 20.

The Count alleges, as to conspiracy to commit HSWF, that Mr. Tyson "did knowingly and intentionally[] conspire . . . to defraud and deprive . . . the citizens of . . . Cuyahoga County of their right to [Mr. Tyson's] honest services."  Indictment, ECF No. 1, ¶ 22(b).  But Mr. Tyson was not a government employee and did not owe a fiduciary duty to "the citizens of . . . Cuyahoga County."  Ohio law is crystal clear that land-bank employees are *not* government employees:  "[N]o employee of [a land bank] . . . shall be deemed to be an employee of the political subdivision for whose benefit the [land bank] is organized solely because the employee is employed by the [land bank]."  Ohio Rev. Code § 1724.02(A)(12).[4]

Neither does Count One include allegations showing that either of the "two time-tested measures of [government] fiduciary status" applies here.  *Turner*, 465 F.3d at 675 (citation and internal quotation marks omitted).  Those two tests are: "(1) a reliance test, under which one may be a fiduciary when others rely upon him because of a special relationship in the government, and (2) a de facto control test, under which a person who in fact makes governmental decisions may be held to be a governmental fiduciary."  *Id.* (citation and internal quotation marks omitted).  Count One is bereft of any allegations concerning any "special relationship" Mr. Tyson had with anyone "in the government" and likewise contains no allegations that Mr. Tyson made "governmental decisions."

---

[4] In *United States v. Douglas*, 398 F.3d 407, 419 (6th Cir. 2005), the Sixth Circuit concluded that an honest services mail fraud indictment that failed to allege a *breach* of fiduciary duty was nevertheless sufficient.  In the present case, however, the issue is not simply failure to allege a breach but rather failure to allege a fiduciary duty in the first instance.  Even more importantly, the present situation is *sui generis*.  The Land Bank is solely a creature of Ohio statute.  And the very statute that provides a basis for its existence also is explicit that its employees are *not* government employees.  In this unique situation, therefore, it is statutorily impossible for the government to properly plead *or* prove that Mr. Tyson owed a fiduciary duty to the "citizens of . . . Cuyahoga County."

Because the indictment fails to allege $5,000 in Land Bank business and fails to adequately allege that Mr. Tyson was a public employee who owed a fiduciary duty to the "citizens of . . . Cuyahoga County," the FFB and HSWF portions, respectively, of the conspiracy charge both fail. Count One should therefore be dismissed.

### III. Count Five of the Indictment—Charging Federal-Funds Bribery—Must Be Dismissed for the Additional Reasons that it is Untimely and Fails to Plead the Threshold Monetary Amount.

Likewise, there are additional reasons to dismiss Count Five of the indictment, which alleges violation of 18 U.S.C. § 666(a)(1)(B)—bribery concerning programs receiving federal funds (federal-funds bribery, or "FFB"). Specifically, the indictment fails as to this count because the charge was not brought until after the limitations period had expired and because, even if it were timely, it does not contain allegations sufficient to satisfy the $5,000 statutory threshold.

### A. The Five-Year Limitations Period Applicable to Count Five Expired Prior to Indictment.

The FFB count fails because the purported acts on which it hinges occurred more than five years before the indictment issued and thus fell outside the applicable limitations period.

A five-year limitations period applies to FFB charges. *United States v. Hansen*, No. 1:09-CR-162, 2010 U.S. Dist. LEXIS 6396, at *2 (W.D. Mich. Jan. 27, 2010); 18 U.S.C. § 3282(a). That five-year clock starts to run as soon as "'the crime is complete.'" *United States v. Pacchioli*, 718 F.3d 1294, 1297 (11th Cir. 2013) (quoting *Toussie v. United* States, 397 U.S. 112, (1970)). That is, the government must obtain an indictment within "five years after" an alleged § 666(a)(1)(B) offense "ha[s] been committed." 18 U.S.C. § 3282(a).

Pursuant to this rule, Mr. Tyson's supposed § 666(a)(1)(B) offense was completed, at the latest, on October 21, 2013—the date on which the indictment alleges that "Drain Guru invoiced M.R. approximately $2,565 for plumbing work completed to repair or install a new waterline at

[Mr. Tyson's] property."  Indictment, ECF No. 1, ¶ 29.  Technically, there are five elements of a § 666(a)(1)(B) violation, but only three of them are subject to "complet[ion]," *Toussie*, 397 U.S. at 115, or "commi[ssion]," 18 U.S.C. § 3282(a), by a would-be defendant[5]:

1.  [Mr. Tyson] was an agent of [the Land Bank];

[2].  [Mr. Tyson] accepted or requested something of value from another person; [and]

[3].  [Mr. Tyson] acted corruptly with the intent to be influenced or rewarded in connection with some business of the Land Bank[.]

*United States v. Beasley*, No. 12-20030, 2014 U.S. Dist. LEXIS 62915, at *13-14 (E.D. Mich. May 7, 2014) (citing 7th Cir. Pattern Crim. Jury Instr., 18 U.S.C. § 666(a)(1)(B) Bribery Concerning Federally Funded Program—Elements).  By the terms of the indictment itself, all of these elements were satisfied by October 21, 2013.[6]  By that date, Mr. Tyson was already an agent of the Land Bank.  *See* Indictment, ECF No. 1, ¶ 1.  He allegedly accepted a thing of value on that date, given that work on his property began—and was invoiced to M.R.—that very day.  *Id.* ¶¶ 29-30.  And, according to the indictment, he had "acted corruptly" in accepting that thing of value, as evidenced by his alleged prior meeting with M.R. and supposed *quid pro quo* agreement.[7]  *E.g.*, *id.* ¶¶ 25-26.

---

[5] The remaining two elements—that "[w]ithin a one-year period, the [Land Bank] received more than $10,000 of federal benefits" and that "[t]he value of the business to which the payment related was at least $5,000"—are discussed directly below.  *United States v. Beasley*, No. 12-20030, 2014 U.S. Dist. LEXIS 62915, at *13-14 (E.D. Mich. May 7, 2014) (citing 7th Cir. Patter Crim Jury Instr., 18 U.S.C. § 666(a)(1)(B) Bribery Concerning Federally Funded Program—Elements)

[6] Mr. Tyson, of course, does not concede that these allegations are all factually correct.  But that is irrelevant for purposes of applying the statute of limitations.

[7] Note, however, that actual execution of the *quid pro quo* is not required to make out a violation of § 666(a)(1)(B).  The Sixth Circuit has stated that "while a '*quid pro quo* of money for a specific . . . act is sufficient to violate [§ 666(a)(1)(B)],' it is 'not necessary.'"  *Abbey*, 560 F.3d at 520 (quoting *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005)).  In this respect, acceptance of a thing of value and corrupt intent are all that are required.

15

The remaining two elements—that "[w]ithin a one-year period, the [Land Bank] received more than $10,000 of federal benefits" and that "[t]he value of the business to which the payment related was at least $5,000"—do not alter the conclusion that the statute of limitations began to run on October 21, 2013. *Beasley*, 2014 U.S. Dist. LEXIS 62915, at *13-14 (citing 7th Cir. Patter Crim Jury Instr., 18 U.S.C. § 666(a)(1)(B) Bribery Concerning Federally Funded Program—Elements). Regarding the requirement that the Land Bank receive more than $10,000 in federal funds in a single year, in alleging this element the government selects the arbitrary, self-serving date range "[f]rom on or about January 24, 2013, through on or about January 24, 2014." *Id.* ¶ 3. But this supposed post-October-21 cut-off date does not prevent the statute of limitations from commencing on October 21. This is so for both legal and factual reasons. Factually, the indictment alleges that the $10,000 in benefits received by the Land Bank during this time period came in the form of "United States Department of Housing and Urban Development Neighborhood Stabilization Funds ('NSP2')." *Id.* But it is public record that all NSP2 funds received by the Land Bank had to be expended by February 11, 2013. Grant Agreement at 1, http://www.cuyahogalandbank.org/documents/CCLRC_NSP2_Grant_Agreement.pdf. Therefore, the window during which the $10,000 in federal benefits accrued closed, at the latest, on that date—long before October 21, 2013.

The legal reasons why this $10,000 requirement does not affect the date on which the limitations period commenced also apply to the other financial element of the offense—that "the value of the [Land Bank] business to which the payment related was at least $5,000." First, both of these financial-threshold elements are context-related facts that the government must prove, not wrongs or acts "complet[ed]," *Toussie*, 397 U.S. at 115, or "committed," 18 U.S.C. § 3282(a), by the would-be defendant. Second, and related, a holding that commencement of the limitations

16

period depends on satisfying the financial-threshold elements would provide the government with a ready means of manipulating the date on which the offense was "complete" in order to avoid the statute of limitations (just as it attempts to do here via manipulation of the $10,000 one-year window) and could allow the government to turn a § 666(a)(1)(B) violation into a continuing offense. Without such a bar, in other words, the government would be able to manipulate these two elements—by combining or separating various payments made by the federal government (to satisfy the $10,000 requirement) or payments made by the Land Bank (to satisfy the $5,000 requirement)—in order to alter the date on which the offense was "committed" and thereby dodge the statute of limitations. In light of these concerns, courts have made clear that when and how the government chooses to calculate the value of the "business[ or] transaction" required by § 666(a)(1)(B) and the value of the "Federal assistance" required by § 666(b) have no bearing on the running of the statute of limitations.

This precise issue was addressed in *United States v. Jones*, 676 F. Supp. 2d 500 (W.D. Tex. 2009). In that case, co-defendants Jones and Sanchez were charged with FFB under § 666. The indictment alleged that Jones had paid $750 to Sanchez, a county official. *Id.* at 503. "[I]n exchange, Sanchez would have" Jones's client "presented [to the county] as the best choice for a [c]ontract" "regarding the digitization of records." *Id.* Sanchez challenged the § 666(a)(1)(B) charge against him on statute-of-limitations grounds. *Id.* at 516-17.

The court held that "[f]or bribery charged pursuant to section 666, the statute of limitation begins to run when each element of the statute is met, *which is when the 'anything of value' is exchanged with the requisite intent to influence or be influenced.*" *Id.* at 518 (emphasis added). Accordingly, the offenses at issue "were completed on January 28, 2004. On that day, Sanchez accepted . . . a thing of value—the $750.00 check. If the facts are as the Government alleged,

17

Sanchez accepted the check with the intent of being influenced . . . .  Hence, this is the day the statute of limitations began to run." *Id.*

Crucially, the court also held:

> **For purposes of the statute of limitations, it is irrelevant that the Government must prove the requisite intent pertained to a transaction valued over $5,000.** The Government's burden does not relate to when the statute of limitations begins to run, nor should it be used by the Government to convert bribery into a continuing crime. The statute of limitations is meant to limit the Government from filing untimely charges and to encourage it to timely investigate possible criminal activity. Thus, the Government's May 28, 2009, Indictment for these charges was untimely.

*Id.* at 518-19 (emphasis added).

The Eleventh Circuit reached this same conclusion in the related context of § 666(a)(2) (criminalizing the actions of the briber rather than, as in the case of § 666(a)(1)(B), the bribee). *United States v. Pacchioli*, 718 F.3d 1294, 1297 (11th Cir. 2013).  In *United States v. Pacchioli*, defendant Pacchioli, an electrical contractor, sought special consideration in the awarding of hospital electrical contracts.  Accordingly, he "curried favor with" the hospital managers tasked with awarding the contracts "by giving them expensive electric generators and installing the generators in their homes, along with performing smaller maintenance tasks." *Id.* at 1298.  "In exchange, [one of the managers] would inform him when contracts were available and would call him and tell him what price he needed to come in at to get the job." *Id.* (internal quotation marks omitted).  The court held that the act of bribery—"that Pacchioli gave a thing of value"—was the "element . . . whose timing determined when the limitations period began to run." *Id.* at 1301.  The two amount-based "elements"—that the "hospitals receiv[ed] more than $10,000 in federal funding in any one-year period" and that the bribe was "in connection with hospital contracts . . . worth more than $5,000"—were, the court said, irrelevant to the statute-of-limitations issue. *Id*

Finally, in *United States v. Musto*, No. 3:10-CR-338, 2012 U.S. Dist. LEXIS 166195 (M.D. Pa. Nov. 21, 2012), a state senator was charged under § 666(a)(1)(B) for allegedly accepting "approximately $1,000" in exchange for the defendant's "assist[ance] with the passage of a multi-million dollar loan application submitted . . . to a state agency that Defendant was involved with through his position as a . . . state senator." *Id.* at *5-7, n.2.  The defendant sought to dismiss this count of the superseding indictment against him, alleging violation of the five-year statute of limitations.  *Id.* at *1.  That superseding indictment had been filed in October 2012.  Regarding the at-issue count, it alleged that the defendant had served as a state senator—and that the $1,000 bribe payment had been made—in October 2006.  Indictment, ECF No. 81, ¶¶ 30, 31, *United States v. Musto*, No. 3:10-CR-338 (M.D. Pa.).  The superseding indictment also alleged that "[t]he Commonwealth of Pennsylvania annually received federal assistance in excess of $10,000 during each one-year period beginning on January 1, 2005 and extending through December 31, 2009." *Id.* ¶ 22.  *See id.* ¶ 28.  But the court rejected the attempt to extend the limitations period via the financial-threshold element, holding that "[t]he elements of the offense, as alleged in the Superseding Indictment, were completed as of October 2006, and the statute of limitations period began running at that time." *Musto*, 2012 U.S. Dist. LEXIS 166195, at *14.  Though the defendant and government had previously entered into tolling agreements that had paused the limitations clock for approximately ten months, still the six years that elapsed between the October 2006 date of the offense and the October 2012 superseding indictment meant that the statute of limitations had run roughly two months prior to indictment.  *Id.* at *2, *14-15.  The count was dismissed.  *Id.* at *14-15.

In short, the financial-threshold elements have no bearing on the statute of limitations. And if the indictment is to be believed, all the substantive elements required for a violation of

§ 666(a)(1)(B) were satisfied by October 21, 2013.  The indictment alleges that, by that date, Mr. Tyson was, to quote the statute, "an agent" of the Land Bank, and had "corruptly solicit[ed]" and "accept[ed]" "[some]thing of value" "in connection with [the] business" of the Land Bank.  18 U.S.C. § 666(a)(1) & (a)(1)(B).  Accordingly, the statute of limitations began to run October 21, 2013 at the latest.  Because Mr. Tyson was not indicted until November 21, 2018—more than five years later—the FFB charge is untimely and must be dismissed.

**B.**    **Count Five Fails to Meet the Required $5,000 Statutory Threshold.**

The FFB count also must be dismissed because the indictment, on its face, fails to allege that the purported bribery scheme involved non-exempt Land Bank business valued at $5,000 or more.  The portions of § 666 under which Mr. Tyson is charged read as follows:

(a) Whoever, if the circumstance described in subsection (b)[8] of this section exists—

> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
>
> * * *
>
> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded **in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more**; . . .

shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a) (emphasis added).

The "organization" or "agency" referred to in paragraph (1) is, as alleged, the Land Bank. Thus, pursuant to the plain language of the statute, the indictment must allege that the purported

---

[8] Subsection (b), in turn, states:  "The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b).

bribery at issue was "in connection with any business, transaction, or series of transactions of [the Land Bank] involving anything of value of $5,000 or more."  18 U.S.C. § 666(a)(1)(B).  Put another way, the indictment must adequately allege that the supposed bribery was "in connection with [Land Bank] business [or] transaction[s] . . . value[d] [at] $5,000 or more."  *Id.  See also Mills*, 140 F.3d at 632 (holding that the $5,000 "transaction" element of § 666(a)(1)(B) is separate from the "anything of value" bribe element).  Indeed, the government itself acknowledges that the $5,000 requirement must be met with respect to the *Land Bank's* own "business [or] transaction[s]," 18 U.S.C. § 666(a)(1)(B):  With respect to Count Five, the government alleges that Mr. Tyson "intend[ed] to be influenced or rewarded in connection with a transaction or series of transactions of the Cuyahoga County Land Reutilization Corporation ('CCLRC') [*i.e.*, the Land Bank] that involved $5,000 or more," Indictment, ECF No. 1, ¶ 57.

The Land Bank "business" or "transaction" at issue here is the award of Land Bank demolition contracts to RCI Services, Inc. ("RCI").  *See* Indictment, ECF No. 1, ¶ 57.  Specifically, the indictment alleges that RCI bid on three different demolition contracts with the Land Bank "[o]n or about November 30, 2013," Indictment, ECF No. 1, ¶ 40; that the Land Bank notified RCI "[o]n or about December 5, 2013" that is was the low bidder on one of those three contracts, *id.* ¶ 41; that RCI officially signed the demolition contract, which required the demolition of four properties, "[o]n or about December 20, 2013," *id.* ¶ 43; that the Land Bank gave RCI formal authorization "[o]n or about January that same date" to proceed with the actual demolition of three of the properties and gave formal authorization as to the fourth "[o]n or about January 14, 2014," *id.* ¶¶ 44-45; and that the Land Bank paid RCI $13,508 "[o]n or about January 24, 2014" after RCI demolished two of the four properties, $12,750 "[o]n or about February 3, 2014" after RCI

demolished the third property, and $6,097 "[o]n or about March 7, 2014" after RCI demolished the final property, *id.* ¶¶ 47-49.

Thus, as the indictment alleges it, the Land Bank business or "transactions . . . that involved $5,000 or more" were the "contract[s] for demolition valued at approximately $32,355." *Id.* ¶ 57. On the surface, then, it appears that the $5,000 requirement has been easily satisfied.  But such a conclusion is premature and, in the end, wrong.  Subsection (c) of § 666 provides:  "This section does not apply to bona fide salary, wages, **fees, or other compensation paid**, or expenses paid or reimbursed, in the usual course of business."  (Emphasis added).  The indictment makes clear that the $32,355 was paid as a result of the work RCI performed pursuant to the terms of its low-bid contract.  There are no allegations that anything untoward—or outside "the usual course of business"—occurred with respect to either that bid or RCI's work.  The "compensation" it received for completing the four demolitions was thus bona fide.  Accordingly, the value of the Land Bank "business" RCI received was, for purposes of the statute, effectively $0.[9]

The Sixth Circuit has addressed this type of situation on multiple occasions and reached this same conclusion.  In *United States v. Mann*, the government brought charges against a vocational school principle who served in his position for many years despite that fact that he did not have the certification necessary to do so legally.  *United States v. Mann*, No. 97-6179, 1999 U.S. App. LEXIS 160, at *2 (6th Cir. Jan. 4, 1999).  Because the school received in excess of $10,000 per year in federal funds, he was charged with FFB, on the theory that the additional

---

[9] It is also important to recall that the Land Bank actually *benefitted* from RCI's addition to the contractor list, as the addition of another potential bidder could only serve to drive down costs for the Land Bank.  Indeed, that is precisely what happened here with respect to the contract that the indictment alleges was awarded to RCI.  RCI was the low bidder, and thus, had it not participated in the bidding process, the Land Bank would have wound up paying a *higher* price for the *same* work.

22

compensation he received upon his promotion from teacher to principal was fraudulently obtained. *Id.* at *3. The district court dismissed the indictment, holding that § 666(c) exempted these "fraudulently" obtained amounts from FFB consideration. *Id.* at *4. The Sixth Circuit affirmed. In doing so, it rejected the government's argument that the "salary was not 'bona fide' or earned in the usual course of business," *id.* at *7, noting that "the position of principal of [the school] is clearly a real and necessary one, and the government concede[d] that Mann performed the duties of his job." *Id.* at *8. Accordingly, the § 666(c) exemption applied.

The result was the same in *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998). There, the defendants, high-ranking officials in the county sheriff's office, were indicted for selling deputy-sheriff positions. *Id.* at 631. The Sixth Circuit, affirming the trial court, held that the salaries paid to the recipients of the ill-gotten positions could *not* be counted in determining whether the $5,000 "business" or "transaction" element was satisfied. *Id.* at 633. Among other things, "the government failed to allege that the salaries received . . . were unnecessary or unjustified." *Id.* at 634. Subsection (c) operated to nullify the indictment. *Id.*

The same result should obtain here. The $32,355 paid to RCI was bona fide compensation for demolition work actually performed, and, as in *Mills*, there are no allegations that that work was "unnecessary or unjustified." *Id.* Accordingly, RCI's compensation *cannot* count toward § 666(a)(1)(B)'s requirement that the Land Bank "business" involved in the alleged bribery was valued at $5,000 or more. The indictment therefore fails to adequately plead this element of FFB, and thus Count Five should be dismissed.

Despite all of the above—including the fact that the government itself has alleged in Count Five that the $5,000 requirement applies to the value of the Land Bank business at issue—the government may argue that the $5,000 threshold applies not to the "business" obtained by RCI

from the Land Bank but instead to the value of the bribe allegedly paid. Were the government to make this argument, it would likely rely on the Sixth Circuit's decision in *United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009). There, the court stated, *in dicta*, that § 666 includes "a requirement that the illegal . . . bribe be worth over $5,000." *Id.* at 521. But there are several reasons not to heed any such argument made by the government. First, this statement from *Abbey* is not only dicta, it is directly contradicted by another passage in Judge Martin's opinion. Elsewhere, the opinion states—correctly—that the statute requires solicitation of (1) "anything of value" as well as (2) "intent to be influenced or rewarded in connection with some transaction involving property or services worth $5000 or more." *Id.* at 520 (internal quotation marks and brackets omitted). Second, the at-issue *Abbey* dicta is also contrary to the *holding* in *Mills*, discussed above. *Supra* at 11-12, 21.

Most importantly, applying the $5,000 threshold to the value of the alleged bribe rather than to the value of the Land Bank services at issue is contrary to the statute's text. Subparagraph (a)(1)(B) clearly separates "solicits[,] . . . demands[,] . . . accepts[,] or agrees to accept, anything of value," on the one hand, from "in connection with any business, transaction, or series of transactions of [the Land Bank] involving any thing of value of $5,000 or more," on the other. Indeed, as set forth above, not only did the Sixth Circuit take this precise position in *Mills*, the *government did as well*. *Mills*, 140 F.3d at 632-33 (government distinguished "the bribery element . . . (*i.e.*, whether the local government agent solicited or accepted 'anything of value')" from the "transaction element (*i.e.*, whether the transaction in connection with which a bribe was received involved 'anything of value of $5,000 or more')").

Finally, other circuits agree with this straightforward statutory interpretation. In *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013), the First Circuit held that "the statutory language

is unambiguous and plainly" provides that "the $5,000 requirement refers to the value of the business, transaction, or series of transactions, not the value of the bribe." *Id.* at 12 (internal quotation marks omitted). The Eleventh and Fifth Circuits have reached the same conclusion. *United States v. McNair*, 605 F.3d 1152, 1185 n.38 (11th Cir. 2010) ($5,000 requirement "refers to the value of the 'business, transaction, or series of transactions,' not the value of the bribe"); *United States v. Duvall*, 846 F.2d 966, 976 (5th Cir. 1988) ("[I]t is clear that the $5000 figure qualifies the transactions or series of transactions that the recipient of the bribe carries out in exchange for receiving 'anything of value.'").

Because Count Five fails to meet the $5,000 FFB threshold, it must be dismissed.

## CONCLUSION

As stated in Part I, above, Mr. Tyson asks this Court to dismiss the indictment in its entirety in light of the false statements and other misinformation presented to the grand jury. Further, Counts One and Five should also be dismissed for the additional reasons stated in Parts II and III.

Respectfully submitted,

/s/ *Chris N. Georgalis*
Christos N. Georgalis (OH: 0079433)
Edward Fadel (OH:0085351)
**Flannery | Georgalis, LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Telephone: (216) 367-2095
Email: chris@flannerygeorgalis.com

*Attorneys for Defendant Kenneth Tyson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 28, 2020, this Defendant's Motion to Dismiss was filed via the Court's ECF system.  Counsel of record will receive notice of, and be able to access, the filing via the ECF system.


 /s/*Chris Georgalis*

Chris Georgalis


*An Attorney for Defendant Kenneth Tyson*