UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:18-CR-708 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH TYSON, | ) | |
| | ) | |
| Defendant. | ) | |


## KENNETH TYSON'S SENTENCING MEMORANDUM

Christos N. Georgalis (OH: 0079433)
Edward Fadel (OH: 0085351)
**Flannery │ Georgalis, LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Telephone: (216) 367-2095
Facsimile: (216) 367-2095
Email: chris@flannerygeorgalis.com
Email: efadel@flannerygeorgalis.com

*Attorneys for Defendant Kenneth Tyson*

# Table of Contents

I.      BACKGROUND ................................................................................................5

II.     ARGUMENT ...................................................................................................7

   A.   THE SENTENCING GUIDELINES RESULT IN A ZONE A, LEVEL 4 CALCULATION .............................................7

      1.   *There is No Loss Amount Attributable to Kenneth's False Statement Conviction.* ....................8

      2.   *The Obstruction-of-Justice Enhancement Pursuant to § 3C1.1 Does Not Apply* .....................10

      3.   *The Ancient, Specious Bribery Theory—Previously Abandoned by the Government—Is Not Relevant Conduct for Purposes of the False-Statement Conviction* ........................................................13

      4.   *The Court Should Not Consider the Dismissed Conduct in Rendering a Sentence Because the Government's Allegations Cannot be Supported by a Preponderance of Evidence* .................................15

   B.   THE APPLICABLE § 3553(A) FACTORS ALSO SHOW THAT A PROBATION-ONLY SENTENCE IS WARRANTED 17

      1.   *Kenneth's History and Characteristics, and the Nature and Circumstances of the Offense, Favor a Probationary Sentence* .........................................................................................18

      2.   *A Probationary Sentence Would Comply with the Purposes of Sentencing Found in § 3553(a)(2)* ..........24

      3.   *A Probationary Sentence Would Comply with § 3553(a)(6)'s Injunction to Avoid Unwarranted Sentencing Disparities* ...............................................................................31

   C.   THE COURT SHOULD NOT IMPOSE A SUBSTANTIAL FINE. ........................................................33

III.    CONCLUSION ............................................................................................36

# Table of Authorities Cited

C<small>ASES</small>

*Gall v. United States,* 552 U.S. 38 (2007) ------------------------------------------------------------------- 18, 24, 27

*Pepper v. United States,* 562 U.S. 476 (2011) ------------------------------------------------------------------ 17

*United States v. Bagwell,* 30 F.3d 1454 (11th Cir. 1994)------------------------------------------------------ 11

*United States v. Charleston,* No. 1:12-CR-289 (N.D. Ohio Aug. 10, 2012) ---------------------------------- 35

*United States v. Collington,* 461 F.3d 805 (6th Cir. 2006) --------------------------------------------------- 17

*United States v. Crousore,* 1 F.3d 382 (6th Cir. 1993) ------------------------------------------------------- 11

*United States v. Duane,* 533 F.3d 441 (6th Cir. 2008)--------------------------------------------------------- 27

*United States v. Duke,* 870 F.3d 397 (6th Cir. 2017)----------------------------------------------------------- 12

*United States v. Edwards,* 595 F.3d 1004 (9th Cir. 2010)----------------------------------------------------- 27

*United States v. Griffith,* 115 F. Supp. 3d 726 (S.D. W. Va. 2015) ------------------------------------------ 9, 14

*United States v. Herlihy,* 336 F.R.D. 217 (D.N.M. 2020) ----------------------------------------------------- 14

*United States v. Horry,* 49 F.3d 1178 (6th Cir. 1995) --------------------------------------------------------- 11

*United States v. Kappes,* 936 F.2d 227 (6th Cir. 1991)-------------------------------------------------------- 13

*United States v. Marshall,* 870 F. Supp. 2d 489 (N.D. Ohio 2012) ------------------------------------------ 18

*United States v. Nesbitt,* 90 F.3d 164 (6th Cir. 1996)---------------------------------------------------------- 11

*United States v. Oliver,* 989 F.2d 501 (6th Cir. 1993) -------------------------------------------------------- 12

*United States v. Partee,* 31 F. 3d 529 (7th Cir. 1994)--------------------------------------------------------- 11

*United States v. Payton* 754 F.3d 375 (6th Cir. 2014) -------------------------------------------------------- 26

*United States v. Peyatt,* No. 5:19-CR-227 (N.D. Ohio 2019------------------------------------------------------ 32

*United States v. Piper,* No. 3:15-CR-261 (N.D. Ohio Jan. 22, 2016)----------------------------------------- 33, 35

*United States v. Riley,* No. 2:08-CR-155 (S.D. Ohio July 30, 2014)----------------------------------------- 16

*United States v. Rothwell,* 387 F.3d 579 (6th Cir. 2004). ----------------------------------------------------- 8

*United States v. Sabino,* 307 F.3d 446 (6th Cir. 2002) ------------------------------------------------------- 12

*United States v. Sager,* No. 1:16-CR-300 (N.D. Ohio Oct. 20, 2017) --------------------------------------- 33, 35

*United States v. Samir Abdelqader,* No. 1:15-CR-445 (N.D. Ohio 2015)----------------------------------- 32

*United States v. Tamela Lee, No.* 1:15-cr-00445 (N.D. Ohio 2015*)* ----------------------------------------- 32

*United States v. Walker,* 119 F.3d 403 (6th Cir. 1997) ------------------------------------------------------- 11

*United States v. Ward,* 814 F.Supp. 23 (E.D.Va. 1993) ------------------------------------------------------- 26

*United States. v. Hill,* 79 F.3d 1477 (6th Cir. 1996) ---------------------------------------------------------- 13

*Williams v. New York,* 337 U.S. 241 (1949) -------------------------------------------------------------------- 18

*Wilson v. Williams,* No. 4:20-cv-794 (N.D. Ohio 2020)------------------------------------------------------- 30

S<span>TATUTES</span>

18 U.S.C. § 1001(a)(2)------------------------------------------------ 6, 14, 31, 32

18 U.S.C. § 3553 --------------------------------------------------------------26, 34

18 U.S.C. § 3553(a) ------------------------------------------------------------ 17

18 U.S.C. § 3553(a)(2)--------------------------------------------------------4

18 U.S.C. § 3553(a)(2)(A)---------------------------------------------- 24

18 U.S.C. § 3553(a)(2)(B)–(D)----------------------------------- 24

18 U.S.C. § 3553(a)(2)(D)---------------------------------------- 28

18 U.S.C. § 3553(a)(6)--------------------------------------------- 31

28 U.S.C. § 994(j)----------------------------------------------------- 27

U.S.S.G § 3C1.1 -------------------------------------------------------------- 10

U.S.S.G § 5C1.1 --------------------------------------------------------------- 27

U.S.S.G. § 1B1.3(a)(1)----------------------------------------------------- 14

U.S.S.G. § 5E1.2(e) ----------------------------------------------------------- 35

U.S.S.G. § 6A1.3(a) ------------------------------------------------------------- 17

Defendant—and first-time offender—Kenneth Tyson hereby submits his Sentencing Memorandum, requesting that the Court impose a probation-only sentence in this case. Such a sentence is supported by the applicable sentencing guidelines, the mandatory § 3553(a) factors, and the facts of this case. Further, a sentence of imprisonment would be, contrary to statute, "greater than [what is] necessary" to achieve the statutory purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

Specifically, the Court should impose a probation-only sentence because Kenneth has zero criminal history and a properly calculated final offense level of 4, placing him well within Zone A on the sentencing table. In fact, even if his offense level were *double* what it properly is or his criminal history category were *tripled*, he still would fall within Zone A. Further, Kenneth's no-loss crime—making one-off, easily contradicted false statements to federal interviewers who arrived unexpectedly at his home in the early hours of the morning—was victimless. Kenneth is a life-long contributor to his community and family. Those he cares for will suffer most from any term of imprisonment. And at 50 years old, the chances of this first-time offender reoffending are practically nonexistent. While Kenneth's conduct was wrong and punishment must be imposed, that punishment must be proportionate and just, *i.e.*, it must reflect the unique circumstances of this offense and take into account Kenneth's otherwise laudable background and character.

## I.     BACKGROUND

Kenneth's life has been dedicated to helping the less fortunate. The first-born child of two loving parents, Kenneth was raised to serve others. From an early age, he helped neighbors take care of their homes in Cleveland and volunteered in his church. After beginning a career in banking, Kenneth turned his attention to social action, returning to school to obtain a master's degree in community development from Case Western Reserve University. He leveraged this additional education and career change to improve the living conditions of Clevelanders. He invested in residential properties, transforming them into safe, well-cared-for homes and renting them largely

to single mothers and their children. He also began a romantic and life partnership with another professional, Celeste Jones, and undertook to start a family with her.

As part of his graduate program, Kenneth interned at the Cuyahoga County Land Bank. He made an excellent impression on his superiors there and was hired by the Land Bank full time after completing his master's degree. Unfortunately, it was during his tenure with the Land Bank that Kenneth became the target of a misguided public-corruption investigation. A cooperator misled the government and convinced it that something widespread and nefarious was afoot at the Land Bank. But that cooperator turned out to be a career criminal and serial deceiver.

Based on the misinformation provided by that deceptive informer, the government indicted Kenneth on November 21, 2018, charging him with five counts of public-corruption and bribery-related offenses. Kenneth was arraigned and released on an unsecured bond on December 7, 2018. The government did not move for detention. A superseding indictment, charging the same offenses but propounded in an attempt to remedy certain defects in its predecessor, was filed February 5, 2020.

Kenneth was innocent of the charges levelled against him in the indictments, but he was not entirely blameless in his conduct with respect to the government's investigation of those charges. When awakened early one morning and questioned in his home by federal agents, a frightened Kenneth, in a momentary lapse of judgment, falsely told the agents that he paid for certain utility-repair work done on a home he owned. In short, the charges against him were false, but he had in fact lied to the agents. So, with his motion to dismiss pending, Kenneth agreed to plead guilty to a Supplemental Information charging a single count of Making a False or Fictitious Statement in violation of 18 U.S.C. § 1001(a)(2). In exchange for the plea, the government agreed to move to dismiss all counts in the original and superseding indictments.

The parties' plea agreement does not include a jointly proposed sentencing range. Accordingly, the parties were subsequently permitted by the Court to brief the issue of which guidelines section should govern calculation of Kenneth's offense level. This Court, in a February 1, 2021 opinion, held that § 2B1.1 governed calculation of Kenneth's offense level and that "Guidelines § 2J1.2 is inapplicable" to Kenneth's case.

There is thus no question at this juncture but that § 2B1.1 governs calculation of Kenneth's base offense level. ECF # 132. And application of that guideline yields a final offense level of four for Kenneth. With zero criminal history, he is very comfortably within Zone A of the Guidelines Sentencing Table, and thus a probation-only sentence is proper. A custodial sentence, by contrast, would be a profound error. The Guidelines, § 3553, case law, the facts of the case, Kenneth's commendable background and community service, and simple common sense are unanimous in commending a probation-only sentence here.

## II.     ARGUMENT

### A.     The Sentencing Guidelines Result in a Zone A, Level 4 Calculation

This Court has already held that Guidelines § 2B1.1, without reliance upon any cross-references found therein, controls calculation of Kenneth's base offense level. Pursuant to that section, Kenneth's base offense calculation—prior to application of any adjustments, enhancements, departures, or variances, all of which the probation office has determined do not apply—is six. Likewise, there is no dispute here but that Kenneth's criminal history category is I. Indeed, Kenneth has *no* criminal history and thus he falls even on the low end of this lowest category. Accordingly, the Sentencing Guidelines make clear that Kenneth is well within the range of defendants for whom a probation-only sentence is appropriate. Furthermore, as probation correctly de-

termined, and as Kenneth has argued throughout the sentencing portion of this case, his final of-fense level is lower still: Kenneth is entitled to a two-point downward adjustment for acceptance of responsibly, thus yielding a final offense level of four.

**1. There is No Loss Amount Attributable to Kenneth's False Statement Conviction.**

No pecuniary loss occurred in this case. And even if one had, it still could not be attributed to Kenneth for sentencing purposes, as there is no evidence or allegation that his crime of convic-tion—making a false statement to federal interviewers—caused any such loss. Probation squarely agrees with Kenneth on this issue. *See* PSR*,* ECF # 133 at 20 ("[T]he probation officer does not believe that there is an actual or intended loss associated with the instant count of conviction."). Any argument to the contrary by the government cannot be supported by law or fact.

The Sixth Circuit has explained that "the Sentencing Guidelines import the legal concept of a causal relationship between the defendant's conduct and the determined loss." *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004). "Causation includes two distinct principles, cause in fact, or what is commonly known as 'but for' causation, and legal causation." *Id.* The govern-ment has the burden to establish both cause in fact and legal causation by a preponderance of the evidence. *Id.* at 582–83.

Here, *neither* type of causation has been—or can be—established, *i.e.*, Kenneth's false statement to the agents did not cause a "loss." Indeed, even the defunct superseding indictment makes clear that the "loss" alleged therein occurred *years before* the offense of conviction. Su-perseding Indictment, ECF #106, at ¶¶ 30-53. Thus, we can say with certainty that Kenneth's false statement did not cause either loss.

Nevertheless, the government argues that a financial loss is attributable to Kenneth for sentencing purposes and should be calculated here based either on the supposed value of the home-improvement services previously received by Kenneth ($6,765) or the value of the alleged contract

that M.R. received ($35,284). Gov't 11/13/20 Br. at 7. But both the home-improvement and the alleged contract occurred in 2013, *years* before the false statements at issue in this case. As already stated, then, this undeniable chronology renders the government's loss argument a nullity. In arguing otherwise, the government gets things backwards, asserting that the water line repair "services" (which comprised a portion of the supposed $6,765 home-improvement services "loss") "were the basis for Tyson's lie and are therefore relevant to the loss calculation." *Id*. To attribute loss to Kenneth for sentencing purposes, the law plainly requires that Kenneth's false statement have caused the "loss," *i.e.*, the home repairs. But the government's argument is the opposite: the home repairs caused the false statement.

On this loss issue, Kenneth's case is on all fours with *United States v. Griffith*, 115 F. Supp. 3d 726 (S.D. W. Va. 2015). There, defendant Griffith lied to IRS agents regarding his knowledge of any cash kickback payments accepted by him in the past. *Id*. at 729-730. The court held that Griffith, who, like Kenneth, pled guilty to making a false statement in violation of 18 U.S.C. § 1001, was not responsible, for sentencing purposes, for loss attributable to a related kickback scheme involving payments made by vendors years prior. *Id*. at 732. Further, the court held that the kickback scheme and its associated loss were not relevant conduct or part of the same course of conduct or plan as Griffith's offense of conviction, because his offense occurred on the specific date that he made a false statement to IRS agents, the kickback scheme had terminated roughly four years prior to that date, and, although Griffith's false statement involved denial of his receipt of kickbacks, the kickback scheme was not, for sentencing purposes, part of or related to the substantive offense of conviction, *i.e.*, the false statement conviction. *Id*. at 735. Here, just like in *Griffith*, Kenneth made a false statement concerning transactions that had occurred years prior,

and the years-later false statement cannot somehow transcendentally be deemed the cause of the earlier "loss."

Finally, and even more fundamentally, neither the $6,765 sum nor the $35,284 sum floated by the government constitutes a "loss"—actual, intended, or otherwise—under the Guidelines. Indeed, Application Note 3 to § 2B1.1 expressly limits "loss" to "pecuniary *harm*." (Emphasis added). The government's $6,765 figure is the supposed value of the home-repair services Kenneth received. But the (soon-to-be-dismissed) indictments do *not* allege that the contractors who performed these services were stiffed. To the contrary, they allege that Kenneth's purported co-conspirator, M.R., paid the bills. Accordingly, no one "lost" $6,765—or *any* sum—with respect to the long-ago home repairs. Likewise, the $35,284 figure represents the value of the Land Bank contracts purportedly awarded to M.R., but there has never been any evidence—or even any *allegation*—that M.R. failed to perform under the contracts or that the Land Bank suffered "pecuniary harm" vis-à-vis the services provided by M.R. No "victim" has come forward to assert a loss. In short, there was no loss of any kind here, let alone a loss caused by Kenneth's false statement. The government's argument to the contrary is meritless.

### 2. The Obstruction-of-Justice Enhancement Pursuant to § 3C1.1 Does Not Apply

Probation accurately determined that no obstruction enhancement applies to Kenneth. Specifically, the PSR notes, "There is no information indicating the defendant impeded or obstructed justice." PSR, ECF #133 ¶ 18. But the government nevertheless will likely continue its misguided and legally unsupported arguments in favor of such enhancement. Those arguments should be rejected. There is no evidence or allegation in the record that Kenneth obstructed the "investigation, prosecution, or sentencing" of his pending false-statement conviction. Application of the obstruction enhancement here would constitute forbidden double counting.

*i.* *Kenneth's conduct does not even satisfy the minimum threshold to consider § 3C1.1 as a viable enhancement*

Kenneth did not "willfully obstruct[] or impede[], or attempt[] to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the ***instant offense of conviction***." U.S.S.G § 3C1.1 (emphasis added). In the Sixth Circuit, application of § 3C1.1 is limited, as the text of the Guideline plainly requires, to circumstances where the obstructive act occurs "during the investigation, prosecution, and sentencing of the instant offense, *i.e.* the offense for which the defendant is being sentenced under the guidelines." *United States v. Crousore,* 1 F.3d 382, 384 (6th Cir. 1993). Here, the "instant offense of conviction" is Kenneth's 2018 false statement, not the specious bribery scheme that purportedly occurred *five years* earlier and has since been abandoned by the government. Therefore, for § 3C1.1 to apply, Kenneth's supposedly obstructive actions must have occurred during the investigation, prosecution, or sentencing of the instant offense, *i.e.*, the false statement. *See, e.g.*, *United States v. Horry*, 49 F.3d 1178, 1181 (6th Cir. 1995) (obstruction must occur solely with respect to the offense of conviction); *United States v. Partee,* 31 F. 3d 529, 531 (7th Cir. 1994) ("This court has defined 'instant offense' to refer 'solely to the offense of conviction.'" (internal citations omitted)); *United States v. Bagwell,* 30 F.3d 1454 (11th Cir. 1994) ("The plain language of the relevant portion of the provision requires that the obstructing conduct occur 'during the investigation . . . of the instant offense'—that is, the offense of conviction."). In other words, in order for § 3C1.1 to apply here, Kenneth would have had to have destroyed evidence of the false statement, perjured himself regarding the false statement, or taken some similar action with respect to the investigation of the false statement.[1] There are *no* facts to support any such finding.

---

[1] The Sixth Circuit has set the outer reaches of the enhancement to include circumstances where a defendant obstructed justice during pending court proceedings very closely related to—but not

      ii.    *Application of the enhancement would constitute impermissible double counting*

Along similar lines, applying the § 3C1.1 enhancement here would amount to impermissible double counting. "[A] court cannot increase the guideline range by applying the same conduct to multiple guideline provisions." *United States v. Oliver*, 989 F.2d 501 (6th Cir. 1993). That is, an enhancement cannot be added to a sentence if exactly the same conduct is relied upon to determine the base offense level *and* that enhancement. *United States v. Sabino*, 307 F.3d 446 (6th Cir. 2002). "[T]he established rule in this circuit is that impermissible double counting occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.'" *Id.* at 450 (internal citations and quotation marks omitted); *see also United States v. Duke*, 870 F.3d 397, 404 (6th Cir. 2017) (same).

Here, the only arguably "obstructive" conduct the government can point to is the false statement made to agents in Kenneth's kitchen on October 10, 2018. But that very act is also the sole basis for the false statement offense itself. The government has not alleged—and indeed, there is no basis for such an allegation—that Kenneth engaged in any obstructive conduct relevant to the prosecution of this false statement. Application of § 3C1.1 here would thus fly in the face of the rule against double counting.

---

technically one-and-the-same as—the prosecution of the defendant for the offense at issue. In *United States v. Walker*, 119 F.3d 403, 406-07 (6th Cir. 1997), for example, the defendant perjured himself at his co-defendant's trial. The Court held that, by so doing, the defendant clearly intended to impede the same investigation that resulted in his plea and conviction. *See also United States v. Nesbitt,* 90 F.3d 164 (6th Cir. 1996) (upholding obstruction enhancement where defendant lied at civil forfeiture proceeding related to his criminal trial). Of course, no such circumstances are present here. Kenneth was not a part of any other related proceedings, he has not been asked to testify at a hearing, nor has any other individual been indicted in connection with the false statement. Nor, *a fortiori*, has he acted to obstruct any such proceedings. Accordingly, *Walker* and *Nesbitt* do not apply.

### 3. The Ancient, Specious Bribery Theory—Previously Abandoned by the Government—Is Not Relevant Conduct for Purposes of the False-Statement Conviction

Kenneth will plead guilty to a single count of making a false statement. This statement—made five-years after the alleged underlying conduct—should be the sole consideration for purposes of the guideline calculation. The government's defunct bribery-related charges are irrelevant to sentencing.

The Sentencing Guidelines commentary provides the following guidance:

> Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity.

U.S.S.G. § 1B1.3 cmt. 5(B)(ii). The Sixth Circuit, in examining the same-course-of-conduct issue, has adopted the commentary's approach, citing the three factors set forth there and describing them as operating on a "sliding scale." *United States. v. Hill*, 79 F.3d 1477, 1482 (6th Cir. 1996).

But no sliding or rebalancing is necessary here, as *all* of these factors show that the abandoned bribery allegations are irrelevant to Kenneth's false-statement conviction and sentence. Regarding degree of similarity, the two sets of allegations—government-program bribery and making a false statement to a federal investigator—are apples and oranges. As to regularity or repetition, neither the purported bribery nor false statement was *ever* repeated. And as to "the time interval between offenses," the two occurred (assuming, counterfactually, the veracity of the government's discarded bribery allegations) *five years apart*.

Examination of case law confirms this analysis and the conclusion that the old bribery allegations have no place in this false-statement case. In *United States v. Kappes*, 936 F.2d 227,

230 (6th Cir. 1991), the Sixth Circuit held that two acts six years apart were not part of the same course of conduct, even where, unlike here, both involved similar misstatements:

> The fact that Kappes may not have been in a position to commit the second offense if he had not committed the first offense does not, by itself, make the second offense "part of the same course of conduct or common scheme or plan" as the first offense. If this type of "but for" reasoning were to gain acceptance, the relevant conduct provision would assume increasingly broad proportions.

*Id.* at 230.

And in *United States v. Griffith*, 115 F. Supp. 3d 726 (S.D. W. Va. 2015), discussed above, the court held that the defendant—who had pled guilty to making a false statement—was not responsible, for sentencing purposes, for loss attributable to an earlier kickback scheme involving payments made by vendors to defendant and others. *Id.* at 732. The *Griffith* court explained:

> Defendant's offense of conviction is making a false, fictitious, or fraudulent statement or representation . . . in violation of 18 U.S.C. § 1001(a)(2). The Scheme—while at least part of the object of Defendant's false statement to IRS special agents—is not the offense of conviction. . . . Additionally, Defendant's involvement in the Scheme terminated roughly four years prior to the false statement that forms the basis for Defendant's offense of conviction. . . . The Scheme therefore did not "occur [ ] during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

*Id.* at 733. *See also* U.S.S.G. § 1B1.3(a)(1).

Kenneth is similarly situated, except that in *Griffith*, unlike here, there was at least a minimal indication that the purported bribery scheme had actually occurred. Thus, like in *Griffith*, the previously alleged (and, here, baseless, and subsequently abandoned) underlying conduct at issue should not be considered relevant conduct for sentencing.[2]

---

[2] Kenneth urges the court to go even further and order Probation to delete the Bribery scheme from the PSR. In *United States v. Herlihy,* 336 F.R.D. 217 (D.N.M. 2020), the court—under similar circumstances—did just that. In *Herlihy,* the court was faced with the issue of whether a $16.5 million dollar loan to improve and renovate a truck stop and a $5.5 million Ponzi scheme were conduct relevant to the offense of conviction: making a false statement to a bank. *Id* at 221. The

**4. The Court Should Not Consider the Dismissed Conduct in Rendering a Sentence Because the Government's Allegations Cannot be Supported by a Preponderance of Evidence**

Kenneth's sentence should be based on his false statement, not the unsupported dismissed conduct. "[F]or any disputed portion of the presentence report or other controverted matter," the court "must . . . rule on the dispute or determine that a ruling is unnecessary." Fed. R. Crim. P. 32(i)(3)(B). Kenneth disputes the veracity of the allegations set forth in the to-be-dismissed Indictment and Superseding Indictment. Kenneth's PSR sentencing calculation is properly based only on the false statement, not the ancient, far-fetched bribery scheme.[3]

The Court should decline to consider dismissed conduct as relevant to sentencing here. Though the government alleged that Kenneth shepherded M.R. through the Land Bank demolition contractor application process, in truth, the government's own witnesses and investigation establish otherwise. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████ M.R.'s business was vetted through the ordinary process, with no undue influence. The underlying allegations of criminal conduct are patently false.

---

court not only answered that question in the negative, it also ordered the PSR purged of reference to the irrelevant conduct *Id.* at 232-233. For the same reason, Kenneth requests that this Court instruct probation to remove the narrative portions associated with the purported bribery scheme from the PSR.

[3] The PSR details the underlying conduct in the Offense Conduct section. *See Final PSR dated March 2, 2021 ECF #133* at ¶¶ *10-16.* But the sentencing calculation is based solely on the false statement conduct and conviction. *Id at ¶¶ 21-29.* Therefore, it is clear that Probation does not deem the underlying conspiracy conduct as Relevant Conduct. Rather, its inclusion is meant as background information to provide the court context to the count of conviction, regardless of the truth of the allegations. *Id* at PageID # 1465.

The government's theory, that Kenneth accepted work at his home as a bribe in exchange for his adding M.R.'s company to the Land Bank contractor list, simply does not hold water. M.R.'s company was added to the list independent of any influence whatsoever from Kenneth. This alleged, to-be-dismissed conduct is false and should not be weighed against Kenneth in the Court's determination of sentencing.

Moreover, the government's allegations were based on uncorroborated self-serving statements from M.R., a blatantly dishonest individual.[4] The government itself, in opposing M.R.'s 2014 motion to terminate supervised release stemming from criminal convictions in both the Southern District of Ohio and Licking County, Ohio, stated that "his criminal record includes nu-

---

[4] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████.

Further, the U.S. Attorney's Office for the Southern District of Ohio previously stated that M.R., on whose uncorroborated statements Paragraph 13 entirely rests, "has a lengthy, serious criminal record, and . . . has previously failed during supervision. . . . [H]e was charged with and convicted of a serious crime, and he has a terrible criminal record. Certain criminal records are so serious or egregious that the offenders should be required to serve the entire period of supervised release. The present conviction[,] coupled with his past criminal history, [is] too egregious to justify a termination of . . . supervised release." Gov't Response to Deft.'s Mot. to Terminate Supervised Release, ECF No. 30, at 496, ████████████████████████████████████ The court agreed and denied M.R.'s Motion to Terminate Supervised Release. Order Denying Mot. to Terminate Supervised Release, ECF No. 32, at 501. ███████████████████████
████.

merous crimes involving deception and dishonesty." *See* Gov't. Resp. to Def.'s Mot. to Termi-nate Supervised Release at 3, ███████████████████████████████████████ ███████████ Thus, not only do the allegations fail to align with the government's own records, they also are based on the word of a man whom, according to *the government*, cannot be trusted.

True, there is no requirement at the sentencing stage that every fact that might relate to a sentencing enhancement be proved beyond a reasonable doubt or that the Court scrupulously adhere to the rules of evidence. Nevertheless, U.S.S.G. § 6A1.3(a) makes clear that, even at this somewhat more permissive stage of the case, a "court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial" only if "that . . . information has <u>sufficient indicia of reliability to support its probable accuracy</u>." (Emphasis added). Here, the information is neither relevant nor reliable. The government's appropriate and voluntary motion to dismiss **all** charges related to the purported bribery conduct highlights that fact.

## B. <u>The Applicable § 3553(a) Factors Also Show that a Probation-Only Sentence Is Warranted</u>

As with the applicable Sentencing Guidelines range, here the § 3553(a) factors, too, strongly favor a probation-only sentence for Kenneth.

Congress mandates that courts "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes listed in 18 U.S.C. § 3553(a). In the Sixth Circuit, after calculating the applicable Guidelines sentencing range, "the district court throws this ingredient into the section 3553(a) mix," taking into account all of the other factors listed in 18 U.S.C. § 3553(a). *United States v. Collington,* 461 F.3d 805, 807 (6th Cir. 2006) (citation omitted). Considering all the § 3553(a) factors, the Court tailors a sentence to be just enough to accomplish the goals of sentencing in light of all the characteristics of the individual standing before them and the crime

17

committed. *Pepper v. United States,* 562 U.S. 476, 487 (2011). A sentence that is too severe fails to promote respect for the law and is unjust. *United States v. Marshall*, 870 F. Supp. 2d 489, 493 (N.D. Ohio 2012). Since every sentence must be individually tailored, a sentencing court may not presume that the Guidelines range is reasonable. *See, e.g.*, *Gall v. United States,* 552 U.S. 38, 50 (2007) (courts must make "an individualized assessment based on the facts presented").

"[T]he punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). In light of Kenneth's profoundly positive history and character-istics, the particular context of his offense, his acceptance of responsibility, his exemplary behavior while on supervision, the extremely low likelihood of recidivism, and the other circumstances unique to this case, a sentence of probation will fulfill the statutory mandate and is the just result here; a sentence of incarceration would be "greater than necessary."

1. **Kenneth's History and Characteristics, and the Nature and Circumstances of the Offense, Favor a Probationary Sentence**

Section 3553(a)(1) requires a court to consider, "in determining the particular sentence to impose," "the nature and circumstances of the offense and the history and characteristics of the defendant." These considerations weigh strongly in favor of a probation-only sentence here. As to the nature and circumstances of the offense, Kenneth's false statement—while undoubtedly wrongful—was isolated and not premeditated. Federal agents woke Kenneth with knocks on his door at 7:05am on October 10, 2018. Kenneth—who had never had any similar experience with law enforcement, let alone federal agents—was startled and taken aback. To be helpful, and against his better judgment to first consult an attorney, Kenneth invited the agents into his home and answered their questions about events that had occurred five years earlier. Fear and anxiety got the better of Kenneth in the moment, and he made the false statements at issue. The statements

were not pre-planned and occurred during a single, minute-long exchange. The false statements were easily disproven by investigators and did not result in harm to any individual.

Regarding Kenneth's "history and characteristics," setting this singular incident aside, he has lived an admirable, even exemplary, life. The first-born son of hard-working parents, Kenneth was raised in a devoted and church-going Cleveland family. His parents provided a loving home built on a commitment to family, hard work, and self-improvement that fundamentally shaped Kenneth's life. *See* PSR, ECF # 133 at ¶ 39. Kenneth is now 50 years old.

Kenneth's core values of hard work and civic mindedness permeate his life story. His father introduced him to property management, not only as a means of personal ownership but, more importantly, as a means to give back to, and improve, the community. At a young age, Kenneth helped his father by mowing the lawns and performing maintenance work at the family's rental properties in Cleveland. These experiences formed the foundation of Kenneth's passion for entrepreneurship and community revitalization.

### i. *Education, real-estate development, and the Land Bank*

Kenneth attended the Ohio State University and graduated with a bachelor's degree from the Fisher College of Business. *See* PSR, ECF #133 at ¶ 45. After graduation, he was recruited into the management training program at Bank One. He later left commercial banking to devote himself full-time to real-estate development, first investing in residential properties and later opening a Donato's pizzeria franchise. He built the pizza shop from scratch, securing the real estate and repurposing the site (a former gas station).[5] A major factor in his success at the pizza shop was his respect for his employees. Kenneth looked out for them, providing bonuses, time-off, and the assurance that they would have the opportunity to work and be paid for every shift they were

---

[5] The State of Ohio awarded Kenneth an adaptive use award for his transformation of a former gas station into a restaurant.

scheduled for. After ten years, Kenneth sold the shop and focused his efforts on residential real estate development, specifically providing safe and affordable housing to some of the most vulnerable members of our community.

Kenneth's interest in housing policy led him back to school in the form of a community-development master's program at Case Western. The graduate program trained individuals to transform communities with high rates of poverty. While in the program, Kenneth focused his studies on housing policy and its impact on underserved communities. In 2011, Kenneth graduated with a Master of Science in Social Administration degree with a concentration in community practice. *See* PSR, ECF #133 at ¶ 45. He put what he learned to good use in his work with the Cuyahoga County Land Bank and in his personal real-estate business.

The Land Bank presented Kenneth with the opportunity to put his studies to practical use. The Land Bank was formed in 2009 in direct response to the foreclosure crisis. Kenneth wanted to play a part in the Land Bank's mission of rebuilding and restoring Cuyahoga County's hardest hit communities. His hard work and devotion did not go unnoticed, and he worked his way up from intern to Property Specialist. He assisted in administering the Cuyahoga County Prosecutor Demolition Fund, the Ohio Attorney General Demolition Program, and the U.S. Environmental Protection Agency Pilot program. In addition, he administered the Land Bank's Side Lot Program, drafted demolition specifications, and worked on many other projects all aimed at improving Cuyahoga County and rebuilding the most vulnerable and under-served communities.

*ii. CLB Services employment and felon re-entry program*

In 2014, the Land Bank launched a for-profit subsidiary, CLB Services ("CLB"), designed to improve the asbestos-remediation process in Cuyahoga County. Land Bank executives asked Kenneth to head up CLB. Kenneth used his new position not only to benefit CLB clients but also

to offer employment opportunities to a chronically underemployed population—formerly incarcerated individuals. Kenneth wanted to provide members of this vulnerable population with the opportunity to earn a living wage while learning a specialized skill. He partnered with an existing organization that provided reentry support. With Kenneth at the helm, CLB paid for the training and equipment that each person needed before he or she could learn, practice, and then earn income from the skill of asbestos remediation. The first two individuals enrolled in Kenneth's program completed it successfully and received the necessary licensure. They succeeded not only within Kenneth's program but went on to secure outside labor-union employment.

Kenneth, as Executive Director of CLB, funded the training of additional individuals who successfully acquired their abatement licenses. Kenneth employed them through CLB, providing them not only with tools and training, but also with a positive work experience. Kenneth was hands-on and frequently visited the work sites. He was personally invested in the success of his employees, and his oversight facilitated the development of their professional responsibility and skills. CLB's former-inmate training program—entirely Kenneth's voluntary creation—allowed individuals who faced significant challenges in securing gainful and reliable employment to acquire a skill, licensure, equipment, accountability, and, ultimately, honest self-sufficiency. Through steadfast and lawful work, these reentry program participants could rebuild their lives, put food on the table, pay their bills, and contribute to their families. Kenneth created and nurtured this program because that is the type of person he is: a man seeking to lift up others.[6]

---

[6] At the end of 2019, CLB closed its doors as the real estate market recovery continued, funding earmarks shifted, and demolitions decreased. Kenneth is proud of the good work done by both CLB and the Land Bank.

### iii. Housing Investments and Redevelopment

Kenneth brings this same commitment of helping others to his work managing his own rental properties. Kenneth's investment philosophy is to make significant improvements up front. This reduces long-term costs and, more importantly, provides for better living conditions for his tenants. As real estate agent, Yvette Head, attests in her character letter, Kenneth has "truly made a difference in some of our customer's lives by giving them a chance to come from low-income housing and move into a thriving community." Character Letter from Yvette Head, **Ex. H**.

Kenneth personally manages all aspects of his properties from renovation to regular maintenance and tenant relations. He reduces rent when necessary and accepts partial payments throughout the month in order to provide stable housing to individuals who might otherwise have a difficult time finding a safe and comfortable place to live. During the COVID-19 pandemic, he has rented to front-line essential workers and single mothers raising young children. Any period of incarceration that takes Kenneth away from his properties will have a disproportionate negative impact on his housing-insecure tenants' access to well-maintained, affordable housing.

### iv. Family, Faith, and Service

Kenneth's dedication to others is reflected not only in his professional life, but in his personal life as well. Kenneth's partner, Celeste Jones, wrote to the Court that Kenneth "is a kind and loving man rooted in Christian principles and showing high integrity and great character." Character Letter from Celeste Jones, **Ex. I**. She attests to his dedication to the New Community Christian Bible Fellowship, where he serves as a greeter and usher. He raises funds for local homeless shelters through his membership with the Men's Golf Team. She also discusses his status as a Cleveland Bridge Builders Leadership Program alumnus. He is an exceptionally hard worker and "leads by example." *Id.*

Marva Dodson—Celeste's mother—also speaks highly of Kenneth's character. Kenneth provides needed emotional support in times of grief and a practical support with home repairs. Kenneth provided significant charitable support to Ms. Dodson's causes. For example, Kenneth commuted from Cleveland Heights to Massillon, Ohio to routinely assist Marva's food drives. Originally, he assisted once a month, but due to the success of the program he was needed twice a month (the first and third Saturday of each month). Marva notes in her letter to the Court that Kenneth "served as a volunteer with Cleveland's City Mission serving meals to the Homeless. He has been there as a support to me during my illness and to us as a family in the passing of loved ones not by just attending services but by supporting us emotionally and many times financially." Character Letter from Marva Dodson, **Ex. J**.

Further, when Kenneth's best friend from high school, Robert D., became drug addicted and homeless, Kenneth arranged for Robert's enrollment in the City Mission's residential recovery program. After completing the program, Kenneth found a sober living house for Robert in Cleveland.

Kenneth's dedication to his own biological family is just as strong. The Tyson family is small and close. Kenneth's parents, married for over 50 years, recently retired to Mississippi. They have medical issues that require Kenneth to step in and take care of them from time to time. Kenneth also maintains his parents' Cleveland home and is an ally to his younger, single sister, who relies on him for advice and support. For example, Kenneth dropped everything and drove his sister to Texas just because he did not want her to be alone for the drive. Character Letter from Karen Tyson, **Ex. K**. Kenneth also looks after his cousin, Chester Mack, Jr., a veteran and disabled stroke victim. Chester currently lives at the VA nursing home in Sandusky. Kenneth manages Chester's finances, making sure that all his bills are paid on time. Kenneth also takes care of

Chester's home in his absence, personally performing upkeep and repairs so that the home is well-maintained.  For example, Kenneth expends his own financial resources to replace and maintain the $CO_2$ detectors and fire alarms.  Kenneth even responded to neighbors' complaints regarding the broken front door.  Kenneth paid for and fixed the door immediately.  This gives Chester, as well as the rest of the family, security, and peace of mind.

### 2. A Probationary Sentence Would Comply with the Purposes of Sentencing Found in § 3553(a)(2)

The Guidelines also require the Court to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment."  *See* 18 U.S.C. § 3553(a)(2)(A).  Additionally, the Court must consider the need for the sentence imposed to adequately deter criminal conduct; protect the public from further crimes of the defendant; and to provide the defendant with needed training and treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a)(2)(B)–(D).  All of these considerations weigh in favor of a probationary sentence as well.

> i. *Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment*

A sentence of probation will adequately reflect the seriousness of the offense, promote respect for the law, and provide a just punishment.

Regarding promotion of respect for the law, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007) (quotation marks and citation omitted).  Kenneth has shown respect for the law by maintaining a law-abiding lifestyle—with the exception

of this lone conviction at 50 years old. Kenneth has also adhered to all pre-trial monitoring requirements set forth by this Court, including travel approvals for medical appointments in New York and compliance with those restrictions. In light of Kenneth's conduct, a sentence of probation will best serve the principles and purposes of sentencing here.

As to the seriousness of the offense and the requirement that punishment be just, Kenneth made a false statement to agents for which he accepts full responsibility. While his false statement was undoubtedly wrongful, it did not ultimately undermine the investigation. Indeed, Kenneth was indicted (on the baseless, to-be-dismissed charges in the original indictment) within a few weeks of this interview. Any harm was truly minimal. Consistent with other cases, a sentence of probation would be just and not demean the seriousness of the offense. *See* Part B, § 3, *infra.*, Comparative Cases Table, **Ex. L.**

All indicators support that this compliance will continue with a sentence of probation. In the years that have passed since he made his false statement to investigators, Kenneth has reflected and thought deeply about his actions that have brought him before this Court. With no criminal history, the prospect of incarceration has weighed heavily on Kenneth. Even without imprisonment, Kenneth faces the consequences of a felony conviction, for which he accepts responsibility.

### ii. *Need to Afford Adequate Deterrence and Protect the Public from Further Crimes of the Defendant*

Section 3553(a)(2)(B) likewise requires a sentencing court to properly weigh "the need . . . to afford adequate deterrence" when fashioning a sentence. As the Supreme Court has said, whether a defendant is likely to "engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper*, 562 U.S. at 492. Here, Kenneth's age and the fact that this is his first offense, combined with his acceptance of responsibility and remorse, strongly suggest that he will not reoffend. As a 50-year-old offender, Kenneth has an exceptionally

low risk of recidivism.  "The Sentencing Commission has observed that '[r]ecidivism rates decline relatively consistently as age increases.'"  *United States v. Payton* 754 F.3d 375 (6th Cir. 2014).(citations omitted) *See also, United States v. Ward*, 814 F.Supp. 23 (E.D.Va. 1993) (finding defendant refrained from commission of his first crime until age 49 was a meaningful factor in imposing sentence).

In fact, a significant portion of the metrics regarding recidivism kept by the Sentencing Commission place Kenneth in the category of least likely to reoffend.  Recently, the Sentencing Commission found that "[o]lder offenders were substantially less likely than younger offenders to recidivate following release."  United States Sentencing Commission, Effects of Aging on Recidivism among Federal Offenders (2017) available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.  Furthermore, "[a]ge and criminal history exerted a strong influence on recidivism.  For offenders in Criminal History Category I, the rearrest rate ranged from 53.0 percent for offenders younger than age 30 at the time of release to 11.3 percent for offenders age 60 or older."  *Id.*  This "pattern is consistent across age groups."  *Id.*  "[A]s age increases recidivism by any measure decline[s]."  *Id.* The study also found that "there was some association between the length of the original federal sentence and rearrest rates.  Offenders with the shortest imprisonment sentences, of up to six months, had the lowest rearrest rates for four of the five age groups studied."  *Id.*

Conversely, the disparate harmful effects that incarceration has on older offenders can hardly be overstated.  For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma."  Elaine Crawley and Richard Sparks, Older Men in Prison: Survival, Coping, and Identity, in the Effects of Imprisonment, 343, 346-47 (Alison Liebling and

Shadd Maruna eds., 2005). Here, then, a term of incarceration is not only unnecessary to satisfy the sentencing objectives set forth in 18 U.S.C. § 3553, it would be *contrary to* that statute.

The Guidelines are in accord with the statute on this point, explicitly urging trial courts to carefully consider "imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[.]" 28 U.S.C. § 994(j); U.S.S.G § 5C1.1, Application Note 4 ("If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment."). A defendant like Kenneth should reserve more lenient treatment in light of his law-abiding life. *See United States v. Duane*, 533 F.3d 441, 453 (6th Cir. 2008) (The Court permitted a 57-year-old defendant to argue that even a category I "overstated his criminal history to some degree." The Court supported the argument that a defendant with no criminal history deserved more lenient sentencing.)

Further, probation is often sufficient punishment to deter criminal conduct. Probation as a deterrent—and punishment—was specifically contemplated by Congress in enacting Section 3553(a): "It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." *United States v. Edwards*, 595 F.3d 1004, 1016 n. 9 (9th Cir. 2010) (internal citation and quotation marks omitted). A sentence of probation is onerous and often sufficient because it places "a substantial restriction of freedom." *Gall v. United States*, 552 U.S. 38, 44 (2007) (though "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms, offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty"). Probationers must adhere to conditions and notify or receive permissions to conduct ordinary activities such as moving or changing jobs, permit unannounced visits to their homes, refrain

from associating with any person convicted of a felony, refrain from excessive drinking, and many other "special conditions" the court may impose. Given the circumstances of this case, a sentence of probation for Kenneth's conduct will sufficiently deter future misconduct and protect the public.

### iii. Need to Provide for Kenneth's Medical Care

The sentence imposed must also ensure that "needed . . . medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). A within-Guidelines probation-only sentence is rendered still more appropriate here in light of Kenneth's medical needs. Not only is Kenneth far older than the average first-time offender. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

In short, while Kenneth is by no means elderly or terminally ill, ███████████████████████████████████████████████████████████████. And, unfortunately, according to the Department of Justice's own Office of Inspector General, the Bureau of Prisons consistently fails to treat medical problems under normal circumstances, to say the least of its breakdown in handling COVID-19 outbreaks. A 2008 OIG audit found that, at a number of institutions, the Bureau of Prisons "did not provide required medical services to inmates." Among other things, the BOP provided inadequate treatment for chronic conditions, failed to properly monitor side effects of medication, and utilized unqualified providers. *See* DOJ OIG, *The Federal Bureau of Prison's Efforts to Manage*

*Inmate Health Care*, ii-xix, 32-34 (2008), available at www.justice.gov/oig/reports/BOP/a0808/final.pdf. Furthermore, according to the Justice Department itself, "BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose." U.S. Justice Dept. Report (May 2015) The Impact of An Aging Prisoner Population on the Bureau of Prisons, Executive Summary Found at https://oig.justice.gov/reports/2015/e1505.pdf.

Because there is a significant risk that a prison sentence would bring with it unintentional, but severe, negative medical consequences for Kenneth, this factor also weighs strongly in favor of a probation-only sentence.

### iv. COVID-19 in Prisons

The ongoing COVID-19 pandemic is yet another reason why Kenneth should not be incarcerated. As the Court is already well aware, the pandemic is a nationwide—indeed, global—crisis the likes of which have never been seen in living memory. As of today, over 115 million people globally—including more than 28 million in the United States—have been diagnosed with the virus.[7] This includes more than 832,000 Ohioans.[8] The virus is unusually contagious and poses a significant risk of death to those who contract it—particularly those with pre-existing conditions that make them more susceptible to the virus's effects. As crucial as a no-holds-barred approach to the coronavirus is to the well-being of the public as a whole, it is even more essential to incarcerated populations. The CDC has noted that, due in part to their close, continual proximity, people in nursing homes and long-term-care facilities are especially susceptible to contracting

---

[7] Johns Hopkins Coronavirus Resource Center (March 3, 2021), https://coronavirus.jhu.edu.
[8] Ohio Dep't of Health Coronavirus Resource Page (March 3, 2021), https://coronavirus. ohio.gov/wps/portal/gov/covid-19/home.

COVID-19.[9]  And as Yale School of Public Health Professor Gregg Gonsalves recently stated, "[y]ou can think of our prisons as sort of nursing homes with bars . . . .  If we're talking about a similarly aging population in our jails here, you're talking about a carceral version of the same situation as you have in Washington State [where nursing homes have been the sites of large COVID-19 outbreaks]."[10]  The close, continuous confines of a prison, in other words, are an almost ideal environment for the spread of the coronavirus.

Locally, the Northern District has recognized the imperative need for distancing measures to stop the spread of COVID-19, some of which cannot be accomplished at an institution.  On April 22, 2020, Judge Gwin, in ordering the release of inmates, recognized that due to "the shockingly limited available testing and the inability to distance inmates, COVID-19 is going to continue to spread, not only among the inmate population, but also among the staff." *Wilson v. Williams*, No. 4:20-cv-794 (N.D. Ohio 2020) , Doc # 22, PageID # 354.  Judge Gwin reiterated again on May 19, 2020, that "[d]istancing has been, and continues to be, the institution's best hope for sparing medically-vulnerable inmates from the serious medical consequences, and potential death, associated with COVID-19." *Wilson v. Williams,* No. 4:20-cv-794 (N.D. Ohio 2020), Doc # 85, PageID # 1125.

In a scathing rebuke of the BOP's position, Judge Gwin ordered the BOP to relax their guidelines and grant release to a larger inmate population consistent with his original order.[11]  *Id.*

---

[9] CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk html.

[10] Lyons, Kelan, *Elderly prisoners in Connecticut vulnerable to potential coronavirus outbreak*, Hartford Courant (Mar. 11, 2020), https://www.courant.com/coronavirus/hc-pol-coronavirus-connecticut-prisons-20200311-ote3jd6orje77ipl44qgi3bb6i-story html.

[11] Judge Sarah Morrison and Judge Dan Polster ordered the release of several detainees recently in ICE custody due to concerns about COVID-19 spreading through jails and prisons.  Heisig, Eric, *ACLU asks judge to release 20 ICE detainees from central Ohio jail with dozens of coronavirus cases,* Cleveland.com (May 5, 2020), https://www.cleveland.com/court-justice/2020/ 05/aclu-asks-judge-to-release-20-ice-detainees-from-central-ohio-jail-with-dozens-of-coronavirus-cases html.

On May 26, 2020, the Supreme Court denied a request by the federal government to put a temporary hold on Judge Gwin's order. Not only do the sentencing guidelines suggest a non-custodial sentence, but public health and safety dictate the same.

Kenneth's medical history poses a greater risk for severe COVID-19 related complications. The link between hypertension and increased risk of fatality from COVID-19 is well documented.[12] At least one study has indicated that the COVID-19 morbidity rate for individuals with hypertension is nearly three times higher than the death rate for individuals without hypertension.[13] Additionally, the Journal of the American Medical Association (JAMA) reports a higher case fatality rate among those with preexisting conditions. Specifically, JAMA notes a 7.3 percent increase for diabetes and 5.6 percent increase for cancer.[14] In short, incarceration would impose health risks upon Kenneth grossly disproportionate to the severity of his offense.

### 3. A Probationary Sentence Would Comply with § 3553(a)(6)'s Injunction to Avoid Unwarranted Sentencing Disparities

The law requires the Court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A review of cases involving defendants with similar records convicted of similar conduct, specifically violations of 18 U.S.C. § 1001(a)(2), shows that a probation-only sentence for Kenneth would be consonant with—indeed, arguably required by—§ 3553(a)(6)'s mandate.

---

[12] *See, e.g.*, Bamforth, *Hypertension Could Be a leading factor in Coronavirus Deaths*, Cleveland.com (March 12, 2020), https://www.cleveland.com/news/2020/03/ hypertension-could-be-a-leading-factor-in-coronavirus-deaths-heres-what-to-know.html.

[13] Shaw, *Mortality, Risk Factors of Patients with Cardiac Injury and COVID-19*, American Journal of Managed Care (March 25, 2020), https://www.ajmc.com/newsroom/mortality-risk-factors-of-patients-with-cardiac-injury-and-covid19.

[14] Zunyou, Wu and McGoogan, Jennifer M. *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (Covid-19) Outbreak in China.* Journal of the American Medical Association (February 23, 2020). https://jamanetwork.com/journals/jama/fullarticle/2762130.

In *United States v. Donald Peyatt*, this Court sentenced Mr. Peyatt to three-years' probation. *United States v. Peyatt,* No. 5:19-CR-227 (N.D. Ohio 2019), ECF #17. Peyatt —a 57-year-old defendant with a prior federal conviction—made false statements to federal investigators during the course of their investigation into his taxes. When federal agents asked Mr. Peyatt about his side-business, he told them that he kept 5% of income from the business. In actuality, Peyatt kept between 10% and 35% of the business's income. Mr. Peyatt pled guilty to making the false statement to the federal investigators. He avoided a prison term, receiving three-years' probation.

Moreover, in *United States v. Samir Abdelqader,* this Court also sentenced Mr. Abdelqader to three years of probation. *United States v. Samir Abdelqader,* No. 1:15-CR-445 (N.D. Ohio 2015), ECF # 58. Abdelqader pled guilty to making false statements to FBI investigators during a public corruption investigation, in violation of 18 U.S.C. § 1001(a)(2). Abdelqader made materially false statements to FBI agents conducting an investigation involving former Summit County Councilwoman Tamela Lee. *See United States v. Tamela Lee,* No. 1:15-cr-00445 (N.D. Ohio 2015)*, ECF #3 ¶¶177-178.* Abdelqader falsified information in connection with Ms. Lee's corrupt involvement with his then-pending juvenile delinquency matter. *Id.* Abdelqader attacked the victim and then Abdelqader struck the victim with a vehicle. *Id* at *¶17.* A police officer witnessed this incident. *Id.* Rather than accept responsibility, Abdelqader conspired with Ms. Lee to influence the outcome of the case.

Lee was ultimately convicted—after trial—of taking cash bribes in exchange for her attempts to influence these court proceedings. This scheme between Abdelqader and Lee was a true undermining of justice where Lee attempted to use her political position to interfere with the administration of the law in exchange for money. Here again, this Court did not impose a prison

term.  Abdelqader and Lee's intrusion into the integrity of judicial events was far worse than Kenneth's conduct, and Kenneth should similarly not receive a sentence of imprisonment for his infraction.

These cases, and those referenced in **Exhibit L**, support the position that a non-custodial sentence is not only appropriate, but necessary, under these circumstances.   *See* Judgment as to Sharon E. Piper; *United States v. Piper,* No. 3:15-CR-261 (N.D. Ohio Jan. 22, 2016) (Bank employee falsely stated that the vault at the branch was in balance when she knew it was missing $145,000.  Sentenced to probation and no fine was imposed.); Judgment as to David R. Sager, *United States v. Sager,* No. 1:16-CR-300 (N.D. Ohio Oct. 20, 2017)  (Where indictment charged embezzlement, Defendant ultimately pled to false statement, obstruction, and false tax return.  Sentenced to probation and no fine was imposed.).

## C.    The Court Should Not Impose a Substantial Fine.

Guidelines § 5E1.2 governs the imposition of fines in cases like Kenneth's.  Part (c)(3) of that section provides that, for an individual, like Kenneth, with an offense level of 4, the minimum and maximum fines are $500 and $9,500, respectively.   But the Guidelines explicitly state that courts have discretion to decline to impose a fine as part of a Guidelines sentence.  *See, e.g.*, U.S.S.G. § 5E1.2; Judgment, ECF No. 12, *United States v. Piper*, No. 3:15-CR-261(N.D. Ohio Jan. 22, 2016)  (discussed *supra* at 33); Judgment, ECF No. 32, *United States v. Sager*, No. 1:16-CR-300 (N.D. Ohio Oct. 20, 2017) (same).  As explained below, no fine should be imposed, but in the alternative, a fine of $500, or community service in lieu of a fine could be imposed in this case.

First, unlike the Guidelines Sentencing Table, which varies the recommended sentencing range for individuals with the same offense level based on the specific individual's criminal history, the Guidelines Fine Table does not take an individual's criminal history category into account. As previously discussed, Kenneth has *no* criminal history, and thus he is on the *low* end of criminal history category I. Accordingly, any fine should be, at most, on the very lowest end of the applicable range.

Closely related to this first reason, no fine (or, at most, a $500 fine) should be imposed in Kenneth's case because his conduct, while wrongful, was an isolated offense of the lowest severity. Like 18 U.S.C. § 3553, Guidelines § 5E1.2(d) requires courts to take into account the "need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim *and the gain to the defendant*), to promote respect for the law, to provide just punishment, and to afford adequate deterrence" when determining the amount of a fine. (Emphasis added). All of these factors point to the propriety of a modest fine in the same way that they pointed to the appropriateness of a non-custodial sentence. *See* Part B, §2, *supra*. Further, the italicized portion of the parenthetical language from (d)(1) is of particular note: Any fine the Court imposes must take into account "the gain to the defendant." Here, Kenneth gained *nothing* from his false statement. He received no financial benefit and was indicted on the misguided bribery charges only weeks after the agents came to his home. The complete absence of financial or other gain strongly counsels either no fine or a minimum fine here.

Third, a substantial fine (one in the thousands-of-dollars range) would have an outsized negative impact on innocent third parties. In addition to maintaining all of his properties as well as caring for the homes of his parents and cousin, Kenneth also works full time. Nevertheless, his rental properties are heavily leveraged, and any significant detrimental effect on his cashflow could

threaten the stability of his tenants' housing. Likewise, any fine will impede Kenneth's ability to travel to Mississippi to visit his elderly parents and assist them as needed and will likewise make it more difficult, if not impossible, for Kenneth to make necessary periodic repairs to his disabled cousin's home.

Fourth, imposing either no fine or a minimal fine is consistent with past practice in this district. In *United States v. Piper*, for instance, Defendant Piper was convicted of making false statements regarding funds missing from the vault at the bank where she was employed. The Court did not order that *any* fine be paid. Judgment, ECF No. 12, *United States v. Piper*, No. 3:15-CR-261 (N.D. Ohio Jan. 22, 2016). Similarly, in *United States v. Sager*, Defendant Sager, initially charged with embezzlement, ultimately pled guilty to false-statement *and* obstruction *and* false-tax-return charges. Sager was sentenced to probation only, and the court declined to impose *any* fine. Judgment, ECF No. 32, *United States v. Sager*, No. 1:16-CR-300 (N.D. Ohio Oct. 20, 2017). *See also, e.g.*, Judgment, ECF No. 7, *United States v. Charleston*, No. 1:12-CR-289 (N.D. Ohio Aug. 10, 2012) (false-statement defendant sentenced to one year probation and a $1,000.00 fine).

Finally, if, notwithstanding the above, the Court is of the view that a fine is necessary in this case, Kenneth respectfully requests that the Court consider ordering community service of equivalent value in place of any such fine. The Guidelines specifically contemplate imposition, in certain situations, of "alternative sanctions in lieu of all or a portion of the fine" and further note that "community service is the generally preferable alternative [sanction]." U.S.S.G. § 5E1.2(e). Though community service would put its own unique strain on Kenneth's busy schedule of work, property maintenance, and service to family, such an arrangement would at least permit him to keep up with his pressing professional and personal financial obligations.

### III. CONCLUSION

For all of these reasons, this Court should impose a probation-only sentence.

Respectfully submitted,

/s/ *Chris N. Georgalis*
Christos N. Georgalis (OH: 0079433)
Edward Fadel (OH: 0085351)

**Flannery │ Georgalis, LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Telephone: (216) 367-2095
Facsimile: (216) 367-2095
Email: chris@flannerygeorgalis.com
Email: efadel@flannerygeorgalis.com

*Attorneys for Defendant Kenneth Tyson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Chris N. Georgalis*

Christos N. Georgalis

*Attorney for Defendant Kenneth Tyson*